# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00698-CV

**Jarnail Maan, d/b/a Hop N Shop, Appellant**

**v.**

**First ATM, Inc., Appellee**

---

**FROM THE COUNTY COURT AT LAW NO. 1 OF TRAVIS COUNTY,**
**NO. C-1-CV-05-001150, HONORABLE J. DAVID PHILLIPS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

This is a restricted appeal from a final summary judgment. First ATM, Inc., sued Jarnail Maan, d/b/a Hop N Shop; and Grace NW Enterprises, Inc., d/b/a Five Corners Gas and Grocery, alleging breach of contract, fraud, and fraudulent inducement in connection with two contracts that Maan allegedly executed with First ATM. First ATM filed a traditional motion for summary judgment on each of its claims against Maan. The motion sought over $50,000 in actual damages, plus attorney's fees. Although Maan filed a pro se answer to First ATM's petition, he did not respond to the summary-judgment motion. The trial court granted First ATM's motion in full. First ATM subsequently non-suited Grace.

In four issues on appeal, Maan argues that the trial court erred in granting the summary judgment because First ATM failed to establish its entitlement to judgment as a matter of law on each of its claims or for the actual damages and attorney's fees awarded in the judgment. In

addition to advocating affirmance, First ATM asserts that we lack subject-matter jurisdiction over Maan's appeal because the underlying controversy is moot and because Maan fails to meet the jurisdictional requirements for bringing a restricted appeal. We conclude we have jurisdiction over Maan's appeal. We will affirm the summary judgment in part, reverse in part, and remand.

## BACKGROUND

First ATM is a Texas corporation in the business of selling and servicing automated teller machines (ATMs). First ATM alleged that it entered into two contracts with Maan. Under one of the contracts, First ATM agreed to sell and provide services for an ATM located in "Hop N Shop," a convenience store in Vancouver, Washington. Hop N Shop is a d/b/a of Maan. Under the other contract, First ATM agreed to lease and service an ATM located in a second Vancouver, Washington convenience store, "Five Corners Gas & Grocery," a d/b/a of Grace NW Enterprises, Inc. Among other terms, each contract entitled First ATM to assess its authorized charges through direct debits on the respective store's bank account. First ATM pled that Maan "stopped allowing Plaintiff to debit" each account. It asserted claims for breach of contract, fraud, and fraudulent inducement against Maan and Grace, and sought actual damages and attorney's fees.

Maan, acting pro se, sent a letter to First ATM's counsel disputing the allegations in the petition. He copied the County Clerk of Travis County, who filed the letter as an answer.

First ATM subsequently filed a traditional motion for "final summary judgment on its causes of action against Jarnail Maan." The motion sought $54,458.17 in actual damages, comprised almost entirely of amounts to which First ATM claimed it was entitled under the contracts as remedies for breach. These amounts included refunds of discounts First ATM purportedly gave on

2

the ATMs and related services, as well as amounts First ATM claimed under a liquidated damages provision. First ATM also sought $3,500 in attorney's fees in its motion. The trial court granted "Final Summary Judgment" for First ATM on its claims against Maan, awarding it the actual damages and attorney's fees it had requested in its motion, plus conditional appellate attorney's fees and "any and all amounts incurred" by First ATM as attorney's fees and/or costs of court in subsequently pursuing liquidation of the judgment. First ATM subsequently non-suited its claims against Grace.

First ATM proceeded to domesticate the judgment against Maan in the State of Washington, and obtained a writ of execution from the Superior Court of King County, Washington. Our record includes a reporter's record from a post-judgment hearing at which First ATM's Washington collections counsel testified regarding execution of the judgment. Counsel recounted that he, accompanied by a King County sheriff or deputy, proceeded to Maan's residence and "demanded satisfaction of the judgment." Maan summoned his Washington counsel. After Maan's counsel arrived, the parties, according to First ATM's Washington counsel, discussed how to "resolve things [] short of the sheriff seizing personal property." Counsel recounted that "the end result was the parties agreed to a global settlement of all claims in this matter." This "global settlement" was for approximately $78,200, which, according to First ATM, included the amount of the judgment, plus the cost of executing the judgment and "significant post-judgment legal fees that had been incurred." After the parties agreed to this amount, they proceeded to Maan's bank (still accompanied by the law enforcement officer), where Maan "filed the necessary paperwork to withdraw a cashier's check for $75,000 that he then gave to the sheriff." Maan also gave the officer

3

approximately $3,200 in cash, which the officer was to deposit with the clerk of the Superior Court of King County, Washington.[1] The following day, on November 9, 2006, Maan filed his notice of restricted appeal.

**ANALYSIS**

**Mootness**

Before we turn to Maan's issues on appeal, we must address, as a threshold matter, whether a live, justiciable controversy continues to exist between the parties.[2] First ATM asserts that Maan's appeal is moot because Maan has already paid the judgment amount. Maan does not dispute that he paid the judgment amount but urges that his appeal is not moot because his payment was not voluntary.

"Usually, when a judgment debtor voluntarily satisfies the judgment, the case becomes moot, and the debtor waives any right to appeal." *Marshall v. Housing Auth. of San Antonio*, 198 S.W.3d 782, 787 (Tex. 2006) (citing *Riner v. Briargrove Park Prop. Owners Inc.*, 858 S.W.2d 370, 370 (Tex. 1993) (per curiam) (citing *Highland Church of Christ v. Powell*,

---

[1] On November 13, 2006, Maan filed with the trial court a motion to supersede the judgment, arguing that the money in possession of the King County clerk's office was "adequate security to supersede the judgment of [the trial court] during the appeal." First ATM responded with a motion for sanctions. Following a hearing in December, the trial court denied Maan's motion. First ATM presented the testimony referenced above in support of its sanctions motion.

[2] The Court, *sua sponte*, also requested additional briefing to clarify whether the summary judgment is final and appealable. As we discuss below, First ATM's summary-judgment motion did not specifically address its fraud or fraudulent inducement claims. We ultimately concluded that the summary judgment, while erroneously granting relief on grounds not presented in First ATM's motion, *see McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993), did purport to dispose of all of First ATM's claims against Maan and, therefore, became final once First ATM non-suited Grace. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 205-06 (Tex. 2001).

4

640 S.W.2d 235, 236 (Tex. 1982))). The rule is intended to prevent a party who voluntarily pays a judgment from later changing his mind and seeking the court's aid in recovering payment. *Id*. (citing *Highland Church of Christ*, 640 S.W.2d at 236). "However, if a party does not voluntarily pay a judgment, his appeal is not moot." *Riner*, 858 S.W.2d at 370. Texas courts have generally considered payment of a judgment after writ of execution issues to be "involuntary," especially when the judgment creditor initiates efforts to execute against the judgment debtor's assets. *Id*. at 370-71 (citing *Cravens v. Wilson*, 48 Tex. 321, 323 (1877)); *Stylemark Const. v. Spies*, 612 S.W.2d 654, 656 (Tex. Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) ("The involuntary nature of the payment is especially evident in the facts as they exist in the case at bar. Appellant only paid the amount in satisfaction of the judgment after the constable came to the appellant's premises attempting to levy execution. Appellant's payment of the judgment under these circumstances surely evidences an involuntary payment") (cited with approval in *Riner*, 858 S.W.2d at 371).

Here, it undisputed that Maan did not pay the judgment until after a writ of execution issued. First ATM's Washington counsel also testified that what he terms the "global settlement" of its claims was reached after counsel, accompanied by a sheriff, arrived at Maan's house to execute the judgment. These facts establish that Maan's payment was not voluntary. *See Riner*, 858 S.W.2d at 370-71; *Stylemark Const.*, 612 S.W.2d at 656. Furthermore, on the next day following this "global settlement," Maan filed his notice of restricted appeal, followed four days later by a motion to supersede the judgment. Maan has not waived his appeal, and his appeal is not moot. *Riner*, 858 S.W.2d at 370-71; *Stylemark Const.*, 612 S.W.2d at 656.

5

**"Non-participation" requirement**

As an additional threshold issue, First ATM asserts that Maan failed to satisfy all of the jurisdictional requirements for filing a restricted appeal. A party filing a restricted appeal must demonstrate that (1) he filed the appeal within six months of the date the judgment was rendered; (2) he was a party to the suit; (3) he did not "participate" in the hearing that resulted in the judgment complained of or file any post-judgment motions or appeals; and (4) error is apparent on the face of the record. Tex. R. App. P. 26.1(c), 30; *Alexander v. Lynda's Boutique*, 134 S.W.3d 845, 848 (Tex. 2004). The first three requirements are jurisdictional and will cut off a party's right to seek relief by way of a restricted appeal if they are not met. *Aviation Composite Techs., Inc. v. CLB Corp.*, 131 S.W.3d 181, 184 (Tex. App.—Fort Worth 2004, no pet.).

The record reflects, and First ATM does not dispute, that Maan filed his notice of appeal within six months of the date of the judgment and that Maan was a party to the underlying lawsuit. It urges, however, that Maan failed to satisfy the "non-participation" element because he was "clearly aware of the running of the appellate timetable in Texas and made a conscious decision to not file any post-judgment motions in Texas and instead went shopping for a different forum." Maan responds that, under Texas law, "the reasons why Maan chose to pursue his remedies in Washington first, or otherwise did not seek relief immediately in Texas, are irrelevant." We agree with Maan.

"Participation" for purposes of a restricted appeal means simply that the appellant participated in the decision-making event that resulted in the judgment adjudicating the appellant's rights. *Parsons v. Dallas County*, 182 S.W.3d 451, 453 (Tex. App.—Dallas 2006, no pet.) (citing

*Texaco, Inc. v. Cent. Power & Light Co.*, 925 S.W.2d 586, 589 (Tex. 1996)).  "It is the *fact* of nonparticipation, not the reason for it," that determines an appellant's right to a restricted appeal. *Texaco*, 925 S.W.2d at 590 (emphasis in original); *Parsons*, 182 S.W.3d at 453.  In the context of a summary judgment, a restricted appeal is only available where appellant neither filed a response nor appeared at the hearing on the summary judgment motion. *Lake v. McCoy*, 188 S.W.3d 376, 378 (Tex. App.—Dallas 2006, no pet.).  We further note that participation is to be construed liberally in favor of a right to appeal. *Davenport v. Scheble*, 201 S.W.3d 188, 196 (Tex. App.—Dallas 2006, pet. denied) (citing *Stubbs v. Stubbs*, 685 S.W.2d 643, 645 (Tex. 1985)); *see Attorney Gen. v. Orr*, 989 S.W.2d 464, 467 (Tex. App.—Austin 1999, no pet.).

In this case, it is undisputed that Maan did not respond to the motion for summary judgment and did not participate in the hearing that resulted in the judgment. Consequently, Maan satisfied the non-participation element for taking a restricted appeal, regardless of the reasons for his nonparticipation.  *See Texaco*, 925 S.W.3d at 590 (disapproving of cases "which hold that an appeal by writ of error [the predecessor to the restricted appeal] is unavailable to those who fail to exercise due diligence or suffer judgment because of their own fault.").  Accordingly, we conclude that we have jurisdiction to consider the merits of Maan's restricted appeal; i.e., whether Maan has demonstrated that the trial court's granting of summary judgment was error apparent on the face of the record.

**Summary judgment**

Turning to the merits, Maan brings four issues in which he contends the district court erred in granting summary judgment for First ATM.  Maan asserts that First ATM failed to establish

7

its entitlement to judgment as a matter of law as to (1) his liability for breach of contract, fraud, and fraudulent inducement; (2) the amount of actual damages awarded in the judgment; (3) the past attorney's fees awarded in the judgment; or (4) the trial court's award of "any and all" attorney's fees and costs that First ATM would later incur in collecting on the judgment.

### *Standard of review*

We review the trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Knott*, 128 S.W.3d at 215-16. In deciding whether there is a disputed material fact issue precluding summary judgment, we take as true proof favorable to the non-movant, and we indulge every reasonable inference and resolve any doubt in favor of the non-movant. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995).

As the movant in a traditional summary-judgment motion on its affirmative claims, First ATM had the initial burden of establishing its entitlement to judgment as a matter of law by conclusively establishing each element of its causes of action. *See M.D. Anderson Hosp. & Tumor Inst. v. Wilrich*, 28 S.W.3d 22, 23 (Tex. 2000) (per curiam) (citing *Rhône-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222-23 (Tex.1999); *Oram v. General Am. Oil Co.*, 513 S.W.2d 533, 534 (Tex.1974)). Only if First ATM met this burden did Maan have a burden to respond to First ATM's motion and raise a genuine issue of material fact precluding summary judgment. *See id.* Consequently, First ATM's summary judgment must stand on its own merits. *Rhône-Poulenc,*

*Inc.*, 997 S.W.2d at 223.  That is, the trial court could not grant the motion by default, and the fact that Maan did not file a response does not preclude him from contending on appeal that First ATM failed to meet its initial summary-judgment burden.  *See id.* (citing *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979)).  Furthermore, First ATM still bears the burden on appeal of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Id.*

First ATM argues that these familiar summary-judgment review standards are, in effect, inverted in the context of a restricted appeal.  In a restricted appeal, as noted, our standard of review is limited to considering whether there is error "apparent on the face of the record." *Alexander*, 134 S.W.3d at 848.  The "face of the record" in a restrictive appeal simply means the entire record in a case, including, as applicable, the clerk's record and reporter's record.  *See Norman Commc'ns v. Texas Eastman Co.*, 955 S.W.2d 269, 270 (Tex. 1997) (per curiam); *DSC Fin. Corp. v. Moffitt*, 815 S.W.2d 551, 551 (Tex. 1991) (per curiam) (reviewing court "may consider all of the papers on file in the appeal, including the statement of facts.").  Error "apparent" on the record means that proof of the error must actually appear in the record on appeal and cannot be inferred from the record.  *Gold v. Gold*, 145 S.W.3d 212, 213 (Tex. 2004) (mere absence of proof that notice of intent to dismiss suit for want of prosecution was sent to plaintiff was not proof "apparent on the face of the record" that plaintiff, in fact, did not receive such notice); *Alexander*, 134 S.W.3d at 849-50 (same).

Invoking the principle that error cannot be "inferred" from the record but must be "apparent," First ATM insists that we may *not* take as true summary-judgment evidence favorable

9

to Maan and must *not* draw reasonable inferences and resolve doubts in Maan's favor, but must instead credit First ATM's summary-judgment evidence as "the only evidence apparent on the face of the record." Relying on this premise, First ATM seems to suggest that because its summary-judgment evidence is the "only evidence in the record" regarding various factual issues (because Maan presented none), we would be "inferring" error if we were to hold that the trial court erred in granting summary judgment. Similarly, First ATM argues that Maan has the burden on appeal to demonstrate the absence of legally or factually sufficient evidence to support the summary judgment. First ATM misconceives our standard of review.

Appellate courts apply the same standards when reviewing traditional summary judgments in both ordinary appeals and restricted appeals. *See Mora v. Southwestern Bell Media, Inc.*, 763 S.W.2d 527, 528 (Tex. App.—El Paso 1988, no writ) (applying same standard of review to reverse summary judgment in appeal by writ of error as in ordinary appeal); *Ridgeline, Inc. v. Crow-Gottesman-Shafer No. 1*, 734 S.W.2d 114, 116-17 (Tex. App.—Austin 1987, no writ) (same); *Davis v. Hughes Drilling Co.*, 667 S.W.2d 183, 184 (Tex. App.—Texarkana 1983, no writ) (same); Tex. R. App. P. 30 (statutes pertaining to former writ of error appeals to the courts of appeals apply equally to restricted appeals). Whether challenged in a restricted appeal or ordinary appeal, First ATM's summary judgment must stand on its own merits, and First ATM has the burden of demonstrating the absence of a genuine issue of material fact with respect to each element of its causes of action. *See Rhône-Poulenc, Inc.*, 997 S.W.2d at 223. If, based on our de novo review of the summary-judgment record, and drawing reasonable inferences in favor of Maan, First ATM did not meet its burden, summary judgment for First ATM would be an error "apparent on the face

10

of the record." *See Mora*, 763 S.W.2d at 528 (in review of summary judgment by writ of error, appellant was entitled to reversal "because the summary judgment proof fails."); *Davis*, 667 S.W.2d at 184 (drawing inferences in favor of non-movant in writ of error appeal of summary judgment).[3]

### *Fraud and fraudulent inducement claims*

Within its first issue, Maan argues that First ATM failed to establish its entitlement to summary judgment on its fraud and fraudulent inducement claims because it did not address these claims in its motion or present evidence establishing its entitlement to judgment on them as a matter of law. We agree.

First ATM's motion was titled "Plaintiff's Motion for Final Summary Judgment Against Defendant, Jarnail Maan." In its introductory paragraphs, First ATM stated that it was moving "for final summary judgment on its causes of action against JARNAIL MAAN"; that "Plaintiff sued Defendant, Jarnail Maan for (1) breach of contract and for (2) fraud and fraud in the inducement"; that "Plaintiff's motion embraces all of the causes of action referred to above," and that "[t]here are no genuine issues of material fact regarding each and every element of the Plaintiff's causes of action." Following the introductory paragraphs and a recitation of the summary-judgment standards was a section of the motion titled "Breach of Contract" in which First ATM identified the essential elements of that claim and urged that its summary-judgment evidence conclusively established each element. Later, within the same section, First ATM asserted that "Defendant's

---

[3] *See also Stowell v. Stowell*, No. 14-02-293-CV, 2003 Tex. App. LEXIS 587, **3-4 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (rejecting argument, similar to Maan's, that standard of review in restrictive appeal of summary judgment requires appellate court to draw inferences in favor of the movant).

above-described breaches of these contracts have caused Plaintiff damages" and purported to establish the specific amount and components of those damages. First ATM concluded this section of its motion with the assertions, "There are no genuine issues of material fact regarding Plaintiff's claim for breach of contract, thus, Plaintiff is entitled to summary judgment on this claim as a matter of law"; and "Plaintiff herein requests final judgment against Defendant, on its claim for breach of contract" for the amount of actual damages it had purported to prove, plus attorney's fees. Immediately following the "Breach of Contract" section was First ATM's prayer that "the Court grant Plaintiff's Motion for Final Summary Judgment on all grounds herein requested."

In contrast to its treatment of its breach-of-contract claims, nowhere in First ATM's motion did it purport to state grounds for summary judgment on its fraud and fraudulent inducement claims. This omission alone precluded summary judgment on these claims. *See McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993).

On appeal, First ATM argues that it presented summary-judgment evidence that Maan breached both contracts and that such proof alone was sufficient to establish its entitlement to summary judgment on its fraud and fraudulent inducement claims. It adds, relying on its view of our standard of review, that we must infer from any contractual breach that Maan committed fraud in initially entering into the contract. Besides overlooking the *McConnell* implications, the existence of a contractual breach alone cannot prove fraud, especially when we must draw all inferences from the summary-judgment evidence in Maan's favor. *See Southern Union Co. v. City of Edinburg*, 129 S.W.3d 74, 92 (Tex. 2003) ("[T]he 'mere failure to perform a contract is not evidence of fraud.'") (quoting *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*,

12

960 S.W.2d 41, 48 (Tex. 1998)); *Schindler v. Austwell Farmers Co-op*, 841 S.W.2d 853, 854 (Tex. 1992). First ATM, in short, did not establish its entitlement to judgment as a matter of law on its fraud and fraudulent inducement claims against Maan. It was not entitled to summary judgment on those claims.

### *Breach-of-contract claims*

Maan further asserts in its first issue that First ATM failed in several ways to establish its entitlement to judgment as a matter of law on its breach-of-contract claims. The elements of a breach-of-contract cause of action are (1) the existence of a valid contract between the parties, (2) the plaintiff performed or tendered performance, (3) the defendant breached the contract, and (4) the plaintiff was damaged as a result of the breach. *New York Life Ins. Co. v. Miller*, 114 S.W.3d 114, 121 (Tex. App.—Austin 2003, no pet.). To meet its burden as to each of these elements, First ATM presented the affidavit of its president, Richard Werlein. In relevant part, Werlein testified that "[m]y company, First ATM, Inc., and Defendant, Jarnail Maan, entered into an ATM processing agreement for Defendant's business, Hop N Shop, on or about July 8, 2004." A copy of what purported to be this agreement was attached as Exhibit B2 to First ATM's motion, and Werlein verified that the exhibit was "[t]he ATM processing agreement for Hop N Shop" and "the original or exact duplicate of the original." Werlein also gave parallel testimony that First ATM and Maan "entered into an ATM processing agreement for Defendant's business, Grace NW Enterprises, Inc., d/b/a Five Corners Gas & Grocery, on or about March 17, 2005," a copy of which was similarly attached to First ATM's motion as Exhibit B1 and authenticated by Werlein.

13

An understanding of the structure of the attached "ATM processing agreements" is helpful in addressing the parties' contentions. As it appears in the summary-judgment record, each agreement is comprised of a single-spaced, four-page printed document titled "Processing Agreement/Space Lease," followed by four pages of "schedules." The Processing Agreement/Space Lease portions of the two agreements are identical. The first line of the Processing Agreement/Space Lease states, "This PROCESSING AGREEMENT (this 'Agreement') is entered into by and between First ATM, Inc., a Texas corporation ('FATM') and the business identified on the signature page hereto (the 'Merchant') as of the date set forth below . . . ." "Merchant" is used throughout to the Processing Agreement/Space Lease to identify the party bound with First ATM to perform the "Agreement's" obligations. The Processing Agreement/Space Lease does not specifically identify the "Merchant" or contain signatures or initials of either party. Signatures and party-specific information instead appears in each accompanying set of schedules. The Processing Agreement/Space Lease defines "Agreement" as "this Processing/Space Lease Agreement in full with **Schedules 1 - 4**,"[4] and contains numerous cross-references to the schedules. The final paragraph of the Processing Agreement/Space Lease further requires that "Merchant and FATM shall acknowledge acceptance of all terms and conditions set forth herein by signing his / her name on **Schedule 1** of this Agreement."

The first of the four pages in each set of schedules contains four schedules titled "Schedule 1A: Company Information"; "Schedule 1B: Merchant/Signator Information";

_____

[4] The boldfaced terms in this and other portions of the Agreements quoted herein reflect their emphasis in the originals.

14

"Schedule 1C: ATM Location Information"; and "Schedule 1D: Signature Page." On the second page are "Schedule 2A: ACH Authorization Release" and "Schedule 2B: Authorization to Release Information." On the third page are "Schedule 3A: Equipment/Services Invoice" and "Schedule 3B: Special Provisions." Finally, on the fourth page of schedules is "Schedule 4: Service Agreement / Parts & Labor Extended Warranty / ATM Configuration." Each schedule has been completed or signed by hand. The schedules in Exhibit B1 contain information unique to Five Corners Gas & Grocery and Grace NW Enterprises, Inc., while the schedules in Exhibit B2 contain information unique to Hop N Shop. Each Schedule 1D, the Signature Page, has been signed by Maan and a First ATM representative.

Regarding each attached "Agreement," Werlein gave identical testimony that "First ATM, Inc. has provided goods and services to Defendant pursuant to the ATM processing agreement attached to this Motion . . . when so requested by Defendant" but that "Defendant has interfered with First ATM's ability to debit the Designated Account, pursuant to the ATM processing agreement attached to this Motion . . . by contacting the financial institution that holds said Designated Account and instructing that institution not to allow debits to the Designated Account without Defendant's authorization and to disallow the monthly service charge on the account as well, in contravention of the terms of the ATM processing agreement." Werlein continued, "Defendant contacted the financial institution that holds said Designated Account and gave the above-described instructions by letters, which he copied to First ATM, Inc., that are attached to this Motion."

Each of the two referenced letters, as Werlein indicated, were attached to First ATM's motion. Both had a return address of "Hop N Shop" at the street address corresponding to the Hop N Shop store location indicated in the schedules portion of the Hop N Shop Agreement.[5] The first letter, dated June 21, 2005, was addressed to "Richard" at First ATM, and stated the following:

> This is further to our telephone conversation on ACH debit $801.29 to our account. Bank has reversed the transaction at our request. Please be advised, First ATM has only been authorized to debit $17.50 a month being service fees and supplies. Any other debit to the account needs prior written approval from the business.
>
> We were shocked to see ACH debit $801.29 being the cost of repair on ATM. First ATM supplied machine that quit normal functioning after couple weeks of installation and my business suffered losses for a long time. First ATM blamed failure on the phone line. At our request <u>Integra</u> and <u>Qwest</u> provided technical assistance three times. Finally they charged us $80.00 and issued **NO FAULT FOUND** certificate. Richard personally took the copy of invoice and has not reimbursed us so far. Please go through paperwork and remit payment at the earliest.
>
> When all efforts failed to correct the problem, First ATM was left with no choice except changing the complete unit and Terminal Identification. Needless to mention the unit was under warrantee.
>
> Instead appreciating, our patience for letting business suffer financially for nearly <u>seven months</u> First ATM opted to make profit out of it. We consider ACH debit to the account without authorization as outrageous, unacceptable and bad business decision. We hope it may not happen again for keeping healthy business relations.
>
> Meanwhile please send us the copy of new contract on Terminal No. A 54828. And warrantee card on the replaced machine installed on February 23, 2005.

---

[5] Specifically, in Schedule 1A (Company Information), Schedule 1C (ATM Location Information), and Schedule 3A (Equipment /Services Invoice).

16

If you have question or comments please contact the undersigned at the earliest.

The letter was signed, "Jarnail Maan." Below this signature, the letter indicates that several other persons were copied. Among the persons copied were First Independent Bank, with the instruction, "All ACH debits to A/C ending with -----2880 may please be referred to us for authorization."

The second letter from Hop N Shop was dated August 1, 2005, and, like the earlier one, was signed by "Jarnail Maan." It stated:

Dear Sir,

Please refer to our previous letter dated July 11, 2005 which could not attract your attention.[6] We did not receive any response which includes copy of the agreement for our records. Virtually we are passing through a situation of mistrust which constitutes unhealthy business relations. This could not be dragged on for long time.

Mean time we are instructing our bank not to honor ACH debit of $17.50 on both of our accounts A 55746 & A 54828 being the cost of supplies and monthly statement fee. You are aware we never received supplies from the day we set up our account and it is over a year now. You may discard sending the monthly statements. So please make a note of it and do not draft any ACH debits to our accounts.

The account "A 55746 " referenced in the second letter corresponds to an "Account #" that appears in the schedules portion of the Five Corners Gas & Grocery Agreement. The other number, "A 54828," corresponds to "the copy of new contract on Terminal No. A 54828 " referenced in Maan's first letter regarding the ATM at the Hop N Shop location.

---

[6] There is no other summary-judgment evidence regarding a letter of this date. The earlier letter from Maan that appears in our record was dated June 21, 2005.

First ATM asserted in its summary-judgment motion that this evidence conclusively established that Maan breached paragraphs 2.2 and 4.10 of the Processing Agreement/Space Lease portion of each Agreement. Paragraph 2.2 states, in relevant part:

> Merchant Representations and Obligations. . . . concurrently with the execution of this Agreement, the Merchant is providing FATM with an ACH Authorization Release attached hereto as **Schedule 2**. The Merchant acknowledges that this release allows FATM to credit and debit the Designated Account from time to time through an ACH Transaction as described below and promises not to interfere with any such activity.

Paragraph 4.10 provides:

> ACH Transaction-Debits. If, at any time, the Merchant is obligated to pay FATM Other Fees or is obligated to FATM for any other payments (whether pursuant to this Agreement or otherwise), such as overages, erroneous deposits, accounts receivable(s), defaults, etc., then FATM shall be entitled to debit the Designated Account using an ACH Transaction.

"ACH Transaction" is defined in the Processing Agreement/Space Lease as "an automated clearinghouse transaction, established for the exchange of funds via electronic transactions." The "Designated Account," in turn, is defined as "the Merchant's account with the financial institution identified on the ACH Authorization Release attached hereto as **Schedule 2**, as it may be amended from time to time in accordance with this Agreement."

Although there is no schedule with the precise title "Schedule 2," there is a "Schedule 2A," titled "ACH Authorization Release," that corresponds to the cross-references in paragraph 2.2 and the "Designated Account" definition. Schedule 2A states, in relevant part:

18

Company authorizes FATM or its designated assigns to initiate ACH transfer entries and to debit and/or credit the account identified herein for all processing services. FATM or its designated assigns shall have the right to credit or debit accounts, on behalf of Company, for settlement of transactions, settlement error corrections, transaction adjustments and any amounts or fees due processor or FATM by Company. . . . This authority is to remain in full force and effect until FATM has received written notification from a designated officer of the Company of its termination in such time and such manner as to afford FATM and depository a reasonable opportunity to act on it. Any debits and credits pursuant to this Authorization will be affected through the Federal Reserve System automated clearing house (ACH) system. The undersigned represents and warrants to FATM (and it's [sic] designated processors and networks) that the person executing the Authorization is authorized signatory on the accounts referenced above and all information regarding the account and the account holder is true and correct.

In each Agreement, Schedule 2A is signed by Maan as "Merchant." Schedule 2A also contains a blank for the financial institution, its routing number, and account information. The financial institution listed for both the Hop N Shop and Five Corners Gas & Grocery accounts is First Independent Bank, the same institution that was cc'd in Maan's first letter.

Though he does not deny signing each set of schedules, Maan argues that First ATM's summary-judgment evidence raises fact issues as to whether he ever agreed to the Processing Agreement/Space Lease. He emphasizes that neither Processing Agreement/Space Lease in the record contains his signature or even a space for signatures or initials.[7] Maan acknowledges,

---

[7] Maan also relies on his pro se answer, in which he asserted that the Processing Agreement/Space Lease "has never [been] presented / discussed or discharged during signing the agreement and shall not be considered a part of the agreement." These pleadings are not competent summary-judgment evidence. *See Laidlaw Waste Sys., Inc. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex. 1995). Nor do they suffice as a response presenting grounds for denying summary judgment. *Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678-79 (Tex. 1979).

19

however, that he signed a Schedule 1D, the "Signature Page," with regard to both Hop N Shop and

Five Corners Gas & Grocery. Schedule 1D states:

> FATM and Merchant both agree to the Terms and Conditions and all other Agreements associated with this Processing Agreement. Both parties agree that they have read all four (4) pages of this Agreement (front and back). Furthermore, both parties agree that there are no other Agreements, written or oral, other than that what is contained herein. This Agreement contains only the following:

> SCHEDULE 01: Processing Agreement / Space Lease
> SCHEDULE 1A: Company Information
> SCHEDULE 1B: Merchant Information
> SCHEDULE 1C: Location Information /ATM Information
> SCHEDULE 1D: Signature Page
> SCHEDULE 2A: ACH Authorization
> SCHEDULE 2B: Authorization to Contact Bank
> SCHEDULE 3A: Equipment/ Services Invoice
> SCHEDULE 3B: Special Provisions
> SCHEDULE 04: Service Agreement

Below were the completed signature blocks.

When signing each Schedule 1D, Maan acknowledged that "this Agreement" included a "Processing Agreement/Space Lease." On appeal, he admits that the "Processing Agreement/Space Lease" in our record "bears this same title" but urges that "nowhere is it designated 'SCHEDULE 01,'" as Schedule 1D identifies the "Processing Agreement/Space Lease." Maan adds that the "Processing Agreement/Space Lease" in our record contains its own cross-references to a "Schedule 1,"[8] which, he suggests, demonstrates that it could not be the same "SCHEDULE 01" referenced in Schedule 1D. Similarly, Maan urges that this "Processing Agreement / Space Lease" contains numerous other cross-references to schedules "1," "2," "3," or

---

[8] E.g., the requirement that "Merchant and FATM shall acknowledge acceptance of all terms and conditions set forth herein by signing his / her name on **Schedule 1** of this Agreement."

"4" that "do not correspond" to the Schedules "1A," "1B," "1C, "1D," "2A," "2B," "3A," "3B," and "04 " used in the signature page and in the titles of the schedules themselves.

When we construe a written contract, our primary concern is to ascertain and give effect to the intentions the parties have objectively manifested in that instrument. *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311-12 (Tex. 2005); *see Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2005) ("As with any other contract, the parties' intent is governed by what they said, not by what they intended to say but did not."). To that end, we construe the contract in its entirety, considering each part in relation to every other part so that effect of each part on others may be determined and that no part will be rendered meaningless. *City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005); *Valence Operating Co.*, 164 S.W.3d at 662. An unsigned paper may be incorporated by reference in the contract signed by the party sought to be charged. *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968). The specific language used is not important so long as the contract signed by the party plainly refers to another writing. *Id.* Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Valence Operating Co.*, 164 S.W.3d at 662. The construction of an unambiguous contract is a question of law for the court. *Willis v. Donnelly*, 199 S.W.3d 262, 275 (Tex. 2006).

First ATM president Werlein testified that Exhibits B1 and B2 to the company's summary-judgment motion were the "ATM processing agreement" that Maan signed on behalf of, respectively, Five Corners Gas & Grocery and Hop N Shop. The signature page, Schedule 1D, in each Agreement incorporated by reference a "Processing Agreement/Space Lease." There is no

21

dispute that Maan signed the Schedule 1D in each Agreement. By signing each Schedule 1D, Maan acknowledged that this "Processing Agreement/Space Lease" was part of the "Agreement" he was executing. "Processing Agreement/Space Lease" corresponds precisely to the title of the four-page, single-space document that immediately precedes each set of schedules in the record. There is no evidence of any other "Processing Agreement/Space Lease." We disagree with Maan's assertions that the cross-references to the schedules appearing within the Processing Agreement/Space Lease "do not correspond" to the accompanying schedules or raise a fact issue as to whether he agreed to the "Processing Agreement/Space Lease." Read in context, each of the references to "Schedule 1"in the Processing Agreement/Space Lease refer to the accompanying Schedule 1A, 1B, 1C, or 1D. For example, paragraph 20.0 of the Processing Agreement/Space Lease required the parties to "acknowledge acceptance of all terms and conditions set forth herein by signing his/her name on **Schedule 1** of this Agreement." "Schedule 1" plainly contemplates Schedule 1D, the Signature Page. Another example is found in paragraph 2.2, which provides that the "Merchant is delivering to FATM the Company/Merchant/Location Addendums attached hereto as **Schedule 1**." "Schedule 1" here clearly refers to Schedule 1A, "Company Information"; 1B, "Merchant/Signator Information"; and 1C, "ATM Location Information." Similarly, the Processing Agreement/Space Lease's cross-references to "Schedule 2" refer to Schedule 2A or 2B, as with paragraph 2.2's acknowledgment that "concurrently with the execution of this Agreement, the Merchant is providing FATM with an ACH Authorization Release attached hereto as **Schedule 2**"—an obvious reference to Schedule 2A, the "ACH Authorization Release." In sum, construing each Agreement as a whole, each manifests the parties' intent to agree to the terms of the Processing Agreement/Space Lease.

22

In the alternative, Maan raises a ground applicable solely to the Five Corners Gas & Grocery Agreement. He argues that First ATM failed to establish as a matter of law that he is personally liable under the Five Corners Gas & Grocery Agreement because Grace NW Enterprises, Inc., and not he, was the primary obligor under this Agreement and that there is no proof he entered into any agreement in his personal capacity to guarantee Grace's obligations under it. In its summary-judgment motion, First ATM attempted to establish that Maan "executed an ATM processing agreement with Plaintiff for his business, Grace NW Enterprises, Inc., d/b/a Five Corners Gas & Grocery, as the merchant and/or individual guarantor of the contract." As noted previously, "Merchant" is the term used throughout each Agreement to identify the party owing obligations to First ATM.[9] On appeal, First ATM concedes that it "was granted summary judgment on its claim that Appellant was liable on the contract that he executed with Five Corners Gas & Grocery as his d/b/a, not because Appellant was a guarantor of some other entity's debt, but because he executed the document as the Merchant." Consequently, whether Maan is personally liable under the Five Corners Gas & Grocery Agreement turns solely on whether, as First ATM asserts, Maan executed the contract in his personal rather than representative capacity.

Maan completed the signature block in Schedule 1D of the Five Corners Gas & Grocery Agreement in the following manner:

MERCHANT DBA:   [handwritten] "Five Corners Gas & Grocery"

By:              [signed by Maan]

Merchant Name:      [handwritten] "Jarnail Maan"

_____

[9] For example, both paragraphs 2.2 and 4.10—the provisions that underlie First ATM's breach-of-contract claims—impose obligations on "Merchant."

23

The corresponding signature block for First ATM includes the following:

FATM:  [typed or printed] First ATM, Inc., a Texas Corporation

By:  _____ [signed]

Rep Name: [handwritten] "John Woolsey"

Standing alone, the identification of "Jarnail Maan" in the blank for "Merchant Name" would seem to indicate that he intended to sign in his personal capacity. Although Maan's signature appears in a blank designating a representative of "Five Corners Gas and Grocery," that business name appears in the blank for "*Merchant* DBA," consistent with Maan signing as a representative of himself.

Maan's name also appears in Schedule 1B in the space for "Merchant Name." Maan's signature similarly appears in blanks for "Signature of Merchant" or "Merchant" in several other schedules. There are no explicit qualifications indicating that Maan was signing as a representative or in any capacity other than his own personal one.

On the other hand, other portions of the schedules and the Processing Agreement/Space Lease suggest the parties' intent to bind Grace as the Merchant rather than Maan, in a manner parallel to First ATM. Schedule 1A identifies "Company Full Legal Name" as Grace NW Enterprises, Inc., and Grace's d/b/a as Five Corners Gas & Grocery—the same d/b/a that appears in the "Merchant DBA" blank in Schedule 1D. Reading the two schedules together would imply that the "Merchant" was Grace and that Maan (who signed Schedule 1D as "Five Corners Gas & Grocery by Jarnail Maan") intended to sign as a representative of the corporation.

Schedules 2A and 2B also suggest that Maan executed the Five Corners Gas & Grocery Agreement as a representative of Grace. As discussed, paragraph 2.2 required that

"concurrently with the execution of this Agreement, the *Merchant* is providing FATM with an ACT Authorization Release . . . [that] allows FATM to credit and debit the Designated Account from time to time through an ACH Transaction. . . ." "Designated Account" is defined as "the *Merchant*'s account with the financial institution identified on the ACH Authorization Release." Schedule 2A, the "ACH Authorization Release," identifies the "Business Name as it Appears on Account" as "Grace NW Enterprises, Inc. dba Five Corners Gas & Grocery." Moreover, the release itself purports to be on behalf of "Company."[10] "Company," again, is identified in Schedule 1A as Grace. The concluding sentence of the Schedule 2A release states, "The undersigned represents and warrants to FATM (and its designated processors and networks) that *the person executing the Authorization is authorized signatory* on the accounts referenced above and all information regarding the account and the account holder is true and correct." Below this, in a line for "Signature of Merchant," is Maan's signature. Read together, these terms seem to indicate that Grace is the "Company" and the "Merchant" referenced in paragraph 2.2, and that Maan, when signing as "Merchant," was acting only as Grace's representative and authorized signatory. The same is true of Schedule 2B—an authorization by "Company" for its financial institution to release information to First ATM—which is similarly signed by Maan as "Merchant."

---

[10] "*Company* authorizes FATM or its designated assigns to initiate ACH transfer entries and to debit and/or credit the account identified herein for all processing services. FATM or its designated assigns shall have the right to credit or debit accounts, on behalf of *Company*, for settlement of transactions, settlement error corrections, transaction adjustments and any amounts or fees due processor or FATM by *Company*. . . . This authority is to remain in full force and effect until FATM has received written notification from a designated officer of the *Company* of its termination in such time and such manner as to afford FATM and depository a reasonable opportunity to act on it. Any debits and credits pursuant to this Authorization will be affected through the Federal Reserve System automated clearing house (ACH) system. . . ." (Emphasis added).

The Processing Agreement/Space Lease contains other indicia that the parties intended Grace to be the "Merchant." The first sentence of the Processing Agreement/Space Lease states that the Agreement (including both the Processing Agreement/Space Lease and the attached schedules) "is entered into by and between First ATM, Inc., a Texas corporation ('FATM') and *the business identified on the signature page hereto (the 'Merchant')* as of the date set forth below . . . ." (Emphasis added). The business identified in the signature page at issue is Five Corners Gas & Grocery, which Schedule 1A indicates is the d/b/a of Grace. Paragraph 1.10 similarly defines "Merchant" as "*the entity* receiving goods and services from FATM" (emphasis added), suggesting a business organization separate from individuals. First ATM emphasizes that this definition continues ". . . as both institution and as individual guarantor," but this is a meaningless phrase under either interpretation of the Agreement. If Maan had signed the Agreement in his personal capacity as the "Merchant," he would be the Agreement's primary obligor and not additionally an "individual guarantor" of its own obligations.[11] Conversely, if Maan signed as a representative of Grace, such assent would be that of the corporation alone and would not bind him personally to anything in the Agreement.

To affirm summary judgment on First ATM's contractual claims against Maan under the Five Corners Gas & Grocery Agreement, we must conclude that, as a matter of law, the parties intended to bind Maan personally as the "Merchant" rather than Grace. For the foregoing reasons, we conclude that this Agreement, on its face, is susceptible to a contrary reasonable

---

[11] First ATM acknowledges as much on appeal, asserting that "Appellant was the individual guarantor of his own debt, thus no written guarantee agreement was required and Appellant's specious argument regarding same is, unsurprisingly, completely irrelevant."

26

interpretation: Maan acted only as a representative of Grace and that the various references to him as "Merchant" contemplated this representative status. Thus, at a minimum, the Agreement is ambiguous as to whether the parties intended to bind Maan personally or Grace as the "Merchant," and a fact issue would remain as to such intent. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.3d 587, 589 (Tex. 1996) (contract is ambiguous if it is susceptible to two reasonable interpretations). Whether this is the *sole* reasonable interpretation of the Agreement—i.e., whether Grace is the "Merchant" as a matter of law—is not yet before us, given the procedural posture of this appeal. We hold only that summary judgment on First ATM's breach-of-contract claim concerning the Five Corners Gas & Grocery Agreement must be reversed and remanded for further proceedings.

In the further alternative, Maan argues that First ATM failed to meet its burden of establishing as a matter of law that he breached either the Hop N Shop Agreement or the Five Corners Gas & Grocery Agreement. As we have reversed the summary judgment with regard to the Five Corners Gas & Grocery Agreement, we need only address the Hop N Shop Agreement. As proof of breach, First ATM relied on the affidavit of its president Werlein, who averred that "Defendant has interfered with First ATM's ability to debit the Designated Account" pursuant to each Agreement "by contacting the financial institution that holds said Designated Account and instructing that institution not to allow debits to the Designated Account without Defendant's authorization and to disallow the monthly service charge on the account as well, in contravention of the terms of the ATM processing agreement." He continued, "Defendant contacted the financial institution that holds said Designated Account and gave the above-described instructions by letters,

27

which he copied to First ATM, Inc., that are attached to this Motion," referring to Maan's letters of June 21 and August 1, 2005.

Maan argues that Werlein's testimony is "conclusory" regarding how Maan "interfered" with First ATM's debiting of the accounts. This amounts to a complaint that Werlein's affidavit is not competent evidence that can support summary judgment. We disagree that Werlein's affidavit is not competent evidence to support the summary judgment. Werlein explained that Maan "contact[ed] the financial institution that holds said Designated Account and instruct[ed] that institution not to allow debits to the Designated Account without Defendant's authorization and to disallow the monthly service charge on the account as well." Werlein also refers specifically to the contents of Maan's letters. We note that the first of the letters indicated it was copied to First Independent Bank, with an instruction requiring prior authorization for certain ACH debits: "**First Independent Bank**: All ACH debits to A/C ending with -----2880 may please be referred to us for authorization."

Maan also urges that First ATM's summary-judgment proof raises fact issues as to whether he ever agreed to pay the "monthly service charge" that Werlein testified Maan instructed First Independent Bank to "disallow." We agree. In his August 1, 2005 letter, Maan indicated that "we are instructing our bank not to honor ACH debit of $17.50 on both of our accounts . . . being the cost of supplies and monthly statement fee." Maan refers us to Schedule 4 of the Hop N Shop Agreement, titled "Service Agreement/Parts & Labor Extended Warranty/ATM Configuration." At the top of this schedule is referenced two fees that total $17.50 in amount—a "Statement Fee" of "$10.00 " and a "Monitoring Fee" of "7.50." Below this, among other terms of this agreement, First ATM is obligated to provide supplies, including "receipt paper, printer ribbons, and light bulbs"

28

free of charge. At the bottom of the page, following the service agreement terms, are provided the following two alternatives, followed by signature lines for "Merchant" and First ATM:



_____ I accept the terms and conditions of this Service Agreement and understand the consideration it requires to be effective for both parties.

_____ I do not accept the terms and conditions of this Service Agreement and agree to pay for all services on a time and materials basis for the term of this contract.

In the Hop N Shop Agreement, an "x" appears in the second blank, signifying a rejection of the terms and conditions of the Service Agreement.[12] Maan's signature appears below this in the space for "Merchant," and a signature also appears on the line for First ATM.

The services and charges described in Schedule 4 correspond to Maan's references to the "ACH debit of $17.50 . . . being the cost of supplies and monthly statement fee" in his August 1, 2005 letter. Drawing all reasonable inferences in Maan's favor, as we must, this evidence presents a fact issue as to whether Maan had agreed to pay "monthly service charges" under the Hop N Shop Agreement that First ATM claims he interfered with. First ATM points out that another reference to a service fee in the amount of $17.50 appears in paragraph 4.6 of the Processing Agreement/Space Lease, which provides that "FATM shall assess a fixed monthly accounting and monitoring fee of **$17.50** with other optional fees for services." However, First ATM did not present summary-judgment proof to clarify the relationship, if any, between this "fixed accounting and monitoring fee" and the fees described in Schedule 4 or which fee Maan or Werlein were

---

[12] Incidentally, in Schedule 4 to the Five Corners Gas & Grocery Agreement, writing appears in both lines.

referencing. Without more, summary judgment was not appropriate on the ground that Maan breached the Hop N Shop Agreement by instructing First Independent Bank to disallow "monthly service fees."

On the other hand, we conclude that First ATM met its burden to conclusively establish that Maan breached the Hop N Shop Agreement by instructing First Independent Bank to require prior authorization for ACH debits to the Hop N Shop account. Such action constitutes a breach of paragraph 2.2 of the Hop N Shop Agreement. Maan did not present summary-judgment proof to controvert these facts or to establish any affirmative defenses he might have asserted against First ATM's claim. We hold that First ATM was entitled to partial summary judgment that Maan breached the Hop N Shop Agreement through this action.

### *Damages and attorney's fees*

In his second issue, Maan challenges the amount of actual damages awarded in the summary judgment. In its summary-judgment motion, First ATM purported to establish its entitlement to judgment as a matter of law "on its claim for breach of contract in the amount of $54,458.17." In its summary-judgment order, the trial court awarded this amount of actual damages, "such amount being equal to the amount of actual damages caused to Plaintiff as a result of Defendant's breaches of the contracts concerned herein." We have reversed summary judgment on nearly all of the claims that are the predicate for these damages awards. We further conclude that First ATM's summary-judgment evidence presents fact issues as to the amount of any actual damages to which First ATM would be entitled for Maan's breach of the Hop N Shop Agreement.

Among the damages First ATM sought in its summary-judgment motion were refunded discounts that it claimed under the Agreements as remedies for Maan's alleged breaches. First ATM's summary-judgment proof is conflicting regarding the value of discounts the company would be entitled to recover under the Hop N Shop Agreement as a remedy for breach. Although discount amounts consistent with those cited First ATM's summary-judgment motion appear in Schedule 3A of the Hop N Shop Agreement, Werlein testified to a different amount. Additionally, First ATM presented no summary-judgment proof that it complied with the contractual prerequisites for obtaining the remedy of refunded discounts. First ATM relies on paragraph 5.2 of the Processing Agreement/Space Lease, which provides:

> Early Termination for Material Breach. Either party may terminate this Agreement at any time if there has been a material breach of this Agreement by the other party (the "Breaching Party"); provided, however, that such party shall provide the Breaching Party with written notice of such breach sent by certified mail, return receipt requested, and if the Breaching Party cures such breach within 30 days of the date of such notice (in writing, certified mail, return receipt requested), then this Agreement shall continue in full force and effect. Upon termination due to any Breach, Merchant shall be required to refund to FATM the value of all discounts received and consideration granted to FATM at that time.

First ATM presented no evidence that it provided the required notice and opportunity to cure. Maan asserts several other grounds challenging the summary judgment as to damages, but we need go no farther in demonstrating that reversal is required on that issue.

In light of our disposition of Maan's first two issues, we must likewise sustain Maan's third and fourth issues challenging the attorney's fee awards. *See State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 437 (Tex. 1995) ("To obtain an award of attorney's fees under . . .

31

Section 38.001 of the Civil Practice and Remedies Code, a party must (1) prevail on a cause of action for which attorney's fees are recoverable, and (2) recover damages."); *see also Tarrant Restoration v. TX Arlington Oaks Apts., Ltd.*, 225 S.W.3d 721, 733 (Tex. App.—Dallas 2007, pet. dism'd) (holding that attorney's fees are only recoverable by "prevailing party" in breach-of-contract action). Finally, having concluded that many of Maan's contentions have merit, we overrule First ATM's request for sanctions against Maan in the amount of $12,950 "for the filing of frivolous appellate pleadings."

## CONCLUSION

We affirm the trial court's summary judgment in part and reverse in part. We affirm partial summary judgment that Maan breached the Hop N Shop Agreement by instructing First Independent Bank to require prior authorization for ACH debits, but reverse and remand the issues of actual damages and attorney's fees on this claim. We reverse the summary judgment as to all other grounds and claims and remand for further proceedings.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed in part; Reversed and Remanded in part

Filed:   December 12, 2008

32