# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00523-CV

**New York Life Insurance Company; New York Life Insurance and Annuity Corporation and Michael Coffey, Appellants**

**v.**

**Phillip M. Miller, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT NO. GN100222, HONORABLE CHARLES F. CAMPBELL, JR., JUDGE PRESIDING**

## O P I N I O N

This case involves a dispute between two life-insurance agents over a large commission. Michael Coffey, an agent of New York Life Insurance Company, was asked by financial advisors of the CEO of Mary Kay Cosmetics to help implement a complex set of estate-planning transactions that included a "split dollar conversion" of a $10 million New York Life term policy. This transaction generated a large commission for Coffey. Phillip Miller, another New York Life agent, was the permanent servicing agent on the policy. Both Miller and Coffey were obligated under their respective contracts with New York Life to follow the rules for client contact. Miller alleged that, although Coffey did eventually contact him about his work on the policy, Coffey violated the rules by failing to contact him as soon as he began to work on the conversion. Miller sued New York Life for breach of its contract with him and for negligent misrepresentation; he also

sued Coffey for tortious interference with Miller's contracts with New York Life. The claims were submitted to a jury, which returned a verdict in Miller's favor. The court rendered judgment on the verdict awarding Miller $38,236.67 on his contract claim and $100,000 on his negligent-misrepresentation claim, both against New York Life, and awarding him $38,236.68 in compensatory and punitive damages against Coffey. The trial court denied New York Life's motions for judgment notwithstanding the verdict, new trial, and remittitur. On appeal, New York Life and Coffey challenge the legal and factual sufficiency of the evidence. We hold that the evidence is legally insufficient to support the findings that New York Life breached its contract with Miller and made a negligent misrepresentation, and the finding that Coffey intentionally interfered with Miller's contract with New York Life. We reverse the trial court's judgment and render judgment that Miller take nothing on his claims.

## BACKGROUND

*Miller as Agent and Successor Agent*

In 1997, Phillip Miller left a career in the non-profit sector to become a New York Life insurance agent. At that time, Miller signed the company's standard agent's contract. Albert Almanza was instrumental in recruiting Miller and became his mentor at New York Life. When Almanza retired in 1999, he made Miller his successor agent. This meant that Almanza turned over his "book of business"[1] to Miller, and Miller became the servicing agent on all of the policies that

---

[1] An agent's "book of business" refers to the list of policyholders for whom he is the assigned servicing agent. It generally consists of policyholders who bought their policies from that agent.

2

Almanza had sold. As a part of this process, Miller signed a second contract, a successor-agent agreement.

The purpose of New York Life's successor-agent program is to provide unbroken service to policyholders when an agent retires. Under the program, the commissions from policies in effect at the time of the succession continue to go to the original agent, while the successor agent receives certain renewal premiums as compensation for servicing the policies. The true value of being a successor agent, however, is the opportunity to establish relationships and make new sales to existing New York Life policyholders. Nothing in the successor-agent agreement gives the successor agent exclusive access to, or the exclusive right to sell New York Life products to, any policyholder.

Before he became Almanza's successor agent, Miller's book of business contained approximately 300 policyholders. Almanza's book of business, compiled over an entire career, was much more extensive, numbering between 1500 and 1800 policyholders.[2] Before approving the succession, New York Life required Miller to hire an administrative assistant and lease additional office space to ensure that he was able to meet his new policy-servicing obligations and take full advantage of his new opportunities to sell New York Life products.

---

[2] Miller testified that before Almanza retired, the two of them "purged" some of the clients from Almanza's book of business, and that after Miller succeeded Almanza, his book of business totaled approximately 1600 policyholders.

### *Richard Rogers's Term-Life Policy*

Almanza's book of business included a $10 million term-life policy[3] written on Richard Rogers, the CEO of Mary Kay Cosmetics. Rogers's estate-planning and insurance matters were handled by a team of financial advisors. Gary Stallard, an independent insurance broker, was the team member in charge of insurance matters. In the early 1990s, Rogers's trustee purchased the New York Life term policy as a part of Rogers's estate plan. Although Stallard can sell New York Life products himself as an independent broker, he instead placed the policy through Almanza and split the commission with him. Stallard testified that he did so at the insistence of Mary Kay's treasurer, Walter Trapp, who was Almanza's personal friend. Stallard also testified that Almanza never interacted with any of the other members of Rogers's estate-planning team.

In early 2000, Stallard began to implement a complex set of transactions called "split-dollar conversions" of Rogers's life-insurance policies.[4] He had been considering such transactions for several years, but the issue had never before reached "the front burner with the team." Because of the extreme complexity of the planning, Stallard began looking for someone with "at least [his] level of expertise when it comes to split-dollar estate planning issues." He testified that he was

---

[3] The Policy was originally a $10 million straight term-life policy. In 1998, however, it was converted to a $10,000 whole-life policy with a $9,990,000 term rider.

[4] The term-life policy at issue was one of several policies in Rogers's estate plan, altogether totaling approximately $60 million in life-insurance coverage.

"mostly concerned about the New York Life [policy]" and wanted "help with the nuances of their product." After asking around the Dallas insurance community, Stallard asked Michael Coffey with the Dallas office of New York Life to work with him on the project. Stallard first asked Coffey to work as a consultant for a fixed fee but eventually offered him a portion of the commissions.[5] Although both Stallard and Coffey worked on converting all of Rogers's insurance policies, they eventually decided that Coffey would take the New York Life commission of $191,183.38 and Stallard would keep the commissions on the other policies. The commission on the New York Life policy represented approximately twenty percent of the total commissions generated by the policy conversions.

### Rules for Client Contact

New York Life has rules of conduct for client contact that require an agent to determine whether another New York Life agent has an established client relationship before becoming involved with a prospective customer. If an agent discovers that a prospective customer has a pre-existing relationship with another New York Life agent, he is required to notify the other agent of the contact. If a dispute over a commission arises, the rules require the agents to submit the dispute to their respective managing partners and then to the agency standards officer for the Zone

---

[5] Miller questioned this testimony in closing argument, citing to an earlier affidavit in which Stallard fails to mention any fee arrangement.

office;[6] the rules additionally provide that the "[m]anaging partner or the Zone will have the authority to decide the assignment of commissions according to their business judgment."

During their initial meeting, Stallard told Coffey about the history of the New York Life policy, noting that Almanza was no longer the servicing agent. A short time later, Coffey asked his managing partner, Mark Koskovich, how he should handle this unusual situation.[7] Koskovich immediately contacted the West Central Zone office and was informed that Coffey needed to contact the current servicing agent.[8] Koskovich relayed this information to Coffey.[9]

Coffey sent Miller the following letter dated March 21, 2000:

> The owner of this contract, Mr. John Rochon of the Richmont Corporation [Mr. Rogers's trustee under his estate plan] and the insured, Mr. Richard R. Rogers [have] asked me to service this contract.

---

[6] In the New York Life hierarchy, a "Zone office" supervises the agents and managers in the general offices—such as the Austin and Dallas offices involved in this case—a single Zone generally covers several states.

[7] There is conflicting evidence about the date on which this discussion took place. In the discovery process, Coffey, Stallard, and Koskovich all initially recalled the events related to Coffey's involvement taking place in March 2000. At trial, however, documentary evidence made it clear that Stallard had contacted Coffey by late January 2000. Both Coffey and Stallard testified at trial that Coffey became involved in January 2000; however, portions of Koskovich's deposition testimony in which he claimed he met with Coffey and called the Zone in March 2000, was made a part of the record.

[8] Koskovich testified that he spoke with Dave Bott. Bott was the chief operating officer of the West Central Zone at that time. Charmaine Goodman, who was the agency standards officer at the time, testified that it was she who spoke with Koskovich.

[9] The exact content of this communication is somewhat unclear. Coffey testified that Koskovich told him that he needed to notify Miller sometime before he actually effected the policy conversion, while Koskovich testified that he "told Mike [Coffey] that he needed to notify the agent in writing that he would be servicing the case," and indicated that Coffey should have notified Miller as soon as he realized that there would be "ongoing activity" on the policy.

> This courtesy letter is to let you know that I will be handling the servicing of this contract according to the wishes of the insured.

When he received the letter on March 27, 2000, Miller filed it away. He did not attempt to speak with Coffey or any of Rogers's estate-planning team, nor did he attempt to speak with his managing partner. Coffey and Stallard effected the policy conversion a little over a week later. When Miller eventually discovered that the policy had been converted and that Coffey had received the full commission, he sent Coffey e-mail and voice-mail messages, and a formal letter, indicating that as the servicing agent he was entitled to some portion of the commission and that he wished to speak with Coffey to resolve the matter. Coffey left Miller voice-mail messages but the two never actually spoke. Coffey testified that he then contacted the Zone office to inform it of the potential dispute, and was told that the Zone would "handle it from this point." Apparently in response to Coffey's call, someone at the Zone office contacted Carl Carter, Miller's managing partner, and asked him to tell Miller to stop attempting to contact Coffey. Miller then discussed his complaint with Carter. Carter testified that he initially did not believe that Miller was entitled to any share of the commission because Miller had not responded to Coffey's letter. Carter nonetheless attempted to contact Coffey's managing partner. When he found that Coffey's managing partner was out of town, Carter contacted the Zone office and was informed that an investigation had been conducted and a decision had been reached. A few weeks later, according to Carter, Miller convinced him that he might be entitled to some portion of Coffey's commission. Carter then asked Miller to detail his position in a letter to him, which he forwarded to the Zone office.

After considering Miller's letter and contacting Coffey to answer some questions, Charmaine Goodman, the agency standards officer for the West Central Zone, decided that in her judgment Coffey was entitled to the full commission. She sent Miller her decision in a letter which addressed each of his complaints. A few weeks later, Miller responded, indicating his surprise that Carter had forwarded his letter to the Zone and asking Goodman to reconsider "the overall circumstances surrounding the transaction." Miller provided Goodman a timeline and claimed that Coffey had not given him adequate time to respond before transacting business with Roger's advisors. Miller also requested an interview. After attempting to reach him by telephone, Goodman sent Miller the following e-mail message:

> . . . [W]e seem to be playing phone tag and I will not be available the rest of the week. I did take the opportunity to review the file again and based on the information you provided in your letter to Carl Carter, your letter dated 6/21 [i.e. Miller's letter to Goodman] and your voice mails we do not see a reason to make any adjustments to our earlier decision. You had not personally written any business on Richard Rogers and he wanted to do business with another agent. The agent from whom you inherited your business (Albert Almanza) also did not have a personal relationship with Rogers.
>
> After Richard Rogers and John Rincon contacted Coffey about handling their insurance, Coffey did notify you in writing on 3/21/00 that Rogers wished to do business with him, according to the code of ethics requirement.
>
> Based upon the above information, we did not find any reason to adjust commissions. I am sorry our response could not have been more favorable.

### The Lawsuit

Miller then filed suit against Coffey and New York Life. He alleged among other things that New York Life was liable for breach of contract and negligent misrepresentation and that

8

Coffey had tortiously interfered with the contractual relationship between Miller and New York Life.[10] The case was tried to a jury, which found that New York Life had breached its contract and made a negligent misrepresentation to Miller. The jury awarded Miller $38,236.67 on the breach-of-contract claim and $100,000 on the negligent-misrepresentation claim. The jury also found that Coffey had tortiously and maliciously interfered with Miller's contract. It awarded Miller $28,677.51 in actual damages and $9559.17 in exemplary damages, totaling $38,236.68, on the tortious-interference claim.[11] The jury's combined awards on the breach-of-contract and tortious-interference claims totaled $76,473.35, precisely forty percent of Coffey's $191,183.38 commission, one-half to be paid by Coffey and one-half charged to New York Life. New York Life and Coffey appeal, claiming among other things that the evidence is insufficient to support these jury findings.

## DISCUSSION

New York Life claims that there is no evidence or factually insufficient evidence to support the jury's findings that it breached its contract with Miller, and that it made a negligent misrepresentation to Miller. Coffey claims that there is no evidence or factually insufficient

---

[10] Miller also alleged that New York Life was liable for fraud and that Coffey was liable for "money had and received / unjust enrichment"; however, these claims were not presented to the jury.

[11] The jury also found that Miller had breached his obligations to New York Life and Coffey—issues raised by counterclaim. There was no damages question submitted with these claims and the jury declined to award attorney's fees in connection with them. The trial court disregarded these findings and rendered judgment on the verdict for Miller.

evidence to support the jury's finding that he tortiously interfered with Miller's contract with New York Life.

To review the evidence under a no-evidence point, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 285-86 (Tex. 1998); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 24 (Tex. 1994). We will uphold the finding if more than a scintilla of evidence supports it. *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). The evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive at the finding given the facts proved in the particular case. *See id.*; *Moriel*, 879 S.W.2d at 25.

### *New York Life's Breach of Contract*

The elements of breach of contract are: (1) that a valid contract existed, (2) that the plaintiff performed or tendered performance, (3) that the defendant breached the contract, and (4) that the plaintiff was damaged as a result of the breach. *Wallace v. Ramom*, 82 S.W.3d 501, 504 (Tex. App.—San Antonio 2002, no pet.); *see Snyder v. Eanes Indep. Sch. Dist.*, 860 S.W.2d 692, 695 (Tex. App.—Austin 1993, writ denied). The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *National Union Fire Ins. Co. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995). Only where a contract is first determined to be ambiguous may the court consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument. *Id.* Whether a contract is ambiguous is a question of law for the court to decide. *Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280,

282 (Tex. 1996). The determination is made by looking at the contract as a whole, in light of the circumstances present at the time the contract was executed. *Id.* If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. *Id.* Parol evidence is not admissible for the purpose of creating an ambiguity. *National Union*, 907 S.W.2d at 520.

At trial, Miller pleaded and argued to the jury that New York Life breached both his agent's contract and his successor-agent agreement. The jury found that New York Life had breached one or both of these agreements and awarded Miller $38,236.67. New York Life argues that there is no evidence to support either of Miller's breach-of-contract theories. We agree.

In his agent's contract, Miller agreed to abide by New York Life's rules as set out in its agent's handbook and elsewhere:

> The Agent hereby (a) acknowledges receipt of the "Agent's Handbook" and agrees to observe and abide by the limitations of authority and the rules specified in or issued as supplements to the Handbook which apply generally to Agents of New York Life; [and] (b) agrees that the Agent's rights to receive commissions and service fees as provided in this contract shall be further subject to the rules relating to commission and service fees as contained in the Agent's Handbook or other published New York Life rules.

Section 14(a) of New York Life's agent's handbook states:

"THE GENERAL REQUIREMENTS CONCERNING COMPENSATION are as follows: . . . (ii) If there is any question or controversy between agents as to who is entitled to compensation for a particular policy, the company's decision thereon shall be final."

New York Life's rules on client contact state:

11

WHEN CONFLICTS CAN NOT BE RESOLVED:

Remember, although it is company policy that any client can work with any agent they may choose, the Company reserves the right in conflict situations under section 14aii of the Agent's Handbook to assign commissions according to the Company's judgment.

In any conflict situation the Managing Partner or the Zone will have the authority to decide the assignment of commissions according to their business judgment.

The decision will be based on all facts relating to the case. Specific attention will be paid to the degree to which you have adhered to these rules and prior violations of the rules. The assignment of commissions, if the agent has been particularly egregious in ignoring these rules, may include the assigning of 100% of the commission on a new sale to the original agent, as well as appropriate disciplinary action.

All decisions will be made on a case by case basis. . . .

Miller spent much of the trial attempting to prove that *Coffey* failed to comply with New York Life's rules of conduct. Larry Reiber—the New York Life training officer who conducted Miller's training—testified that Coffey should have notified Miller sooner of his involvement with Stallard and that the letter Coffey sent to Miller was inadequate. However, instead of suing Coffey for breach of his agent's contract with New York Life on a third-party-beneficiary theory, Miller sued *New York Life* for breach of *Miller's* own agent's contract and successor-agent agreement, and sued Coffey for tortious interference with those contracts.

The consistent theme of Miller's argument and evidence below was that by allowing Coffey to keep the entire commission, New York Life failed to "protect" Miller's book of business. He continues this line of argument on appeal, claiming that "New York Life had an obligation to prevent Coffey from raiding his newly earned book of business" and that "[t]o sanction Coffey's raid

on Miller's book of business is to pretend that New York Life never approved its successor agreement with Miller."

Miller's argument that his successor-agent agreement was breached is somewhat confusing because the agreement itself does not address commission disputes. As discussed above, the successor-agent agreement simply makes Miller the permanent servicing agent for Almanza's former clients. Miller introduced as parol evidence his own testimony that Carter "led [him] to believe" that the business he inherited from Almanza would be "protected," although he admitted that the written agreement contained no such promise. The remainder of the testimony relating to "protection" of Miller's business relates to the degree of protection that Miller was entitled to under the rules of client conduct, a part of his agent's contract.[12]

In order to have a binding contract, the essential terms must be sufficiently certain to define the rights of the parties. *See Stinger v. Stewart & Stevenson Serv., Inc.*, 830 S.W.2d 715, 720 (Tex. App.—Houston [14th Dist.] 1992, writ denied). A vague assertion that Miller's business would be "protected" to some unspecified degree is itself far too indefinite to create a binding contractual obligation. Moreover, it is only when a contract is first determined to be ambiguous that courts may consider the parties' interpretation. *National Union*, 907 S.W.2d at 520. If contract language is not fairly susceptible to more than one meaning, extrinsic evidence is inadmissible to

---

[12] Although his position is not entirely clear, both at trial and on appeal Miller attempts to link the two contracts. His position seems to be that because New York Life's rules for client contact, incorporated into his *agent's contract*, were violated with respect to a policy he was servicing as a successor agent, his successor-agent agreement was therefore breached, along with his agent's contract, because New York Life failed "to prevent Coffey from [breaching the rules and thereby] raiding his newly earned book of business."

13

contradict or vary the meaning of the explicit language of the parties' written agreement. *Id.* at 521.

Here, the precise degree of protection that New York Life owed Miller under his contracts is explicit.

If a commission dispute arises, Miller is entitled to have New York Life resolve the dispute in its

business judgment. The fact that New York Life resolved the dispute between Miller and Coffey

in a way that Miller does not agree with does not indicate that it breached its contract.[13] *See Stinger*,

830 S.W.2d at 721 ("the fact that the company decided to act on its discretionary power [to adjust

commissions] to appellant's detriment does not make it a breach of contract"). Goodman resolved

the commission dispute based on the facts relating to the case. She considered among other things

the degree to which Coffey had complied with the rules as she interpreted them, the length of the

period between Coffey's notification and the conversion of the policy, the fact that neither Almanza

nor Miller had been personally involved with Rogers or Rogers's estate-planning team, and the fact

that the client clearly desired to do business with Coffey. Miller simply disagreed with Goodman's

determination and sought to have a jury readjudicate his commission dispute with Coffey.[14]

---

[13] The rules for client conduct state:

> If a conflict occurs . . . [with an agent from another office] and you are unable
> to resolve [it] on a personal level, you should contact your Managing Partner
> to discuss and settle the matter with the other Managing Partner involved. If
> the Managing partners involved can not resolve the conflict, the matter should
> be referred to the Agency Standards Office in the Zone/Zones for resolution.

It could perhaps be argued that New York Life breached its contract when Miller's managing partner, Carter, forwarded his complaint to the Zone office without first making contact with Coffey's managing partner, Koskovich. However, we do not think this language creates an affirmative obligation to always attempt to resolve disputes at the managing-partner level before going to the Zone. Indeed the Zone may already be involved, as it was in this case.

[14] In effect this is what the jury did by awarding Miller breach of contract and tortious interference damages that totaled forty percent of the $191,183.38 commission, to the penny.

New York Life did not make any contractually binding promise that, as a successor agent, Miller would be automatically entitled to a share of commissions on future transactions involving the policyholders to whom he was assigned. Moreover, under the unambiguous provisions of the agent's contract, agent's handbook, and rules for client contact, New York Life acted within its right to resolve the commission dispute between Miller and Coffey. We sustain New York Life's first issue, reverse the judgment of the trial court that New York Life breached its contract with Miller, and render judgment that Miller take nothing on his breach-of-contract claim.[15]

*Negligent Misrepresentation*

To establish a claim for negligent misrepresentation, Miller was required to prove that, without exercising reasonable care or competence, New York Life made a representation in the course of its business, or in a transaction in which it had a pecuniary interest, which contained "false information" for the guidance of Miller in his business. *See Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). He also was required to prove that he suffered pecuniary loss by justifiably relying on the information. *See id.* Significantly, the sort of "false information" contemplated in a negligent-misrepresentation case is a statement of *existing fact*, not a promise of future conduct. *Key v. Pierce*, 8 S.W.3d 704, 709 (Tex. App.—Fort Worth 1999, pet. denied); *Allied*

---

[15] The trial court awarded Miller his attorney's fees of $79,000 against New York Life pursuant to section 38.001(8) of the civil practice and remedies code, which provides for recovery of attorney's fees "if the claim is for . . . an oral or written contract." *See* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 1997). To recover attorney's fees under this section a party must both prevail on the cause of action for which attorney's fees are recoverable and recover damages. *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997); *Great Am. Prods. v. Permabond Int'l*, 94 S.W.3d 675, 684 (Tex. App.—Austin 2002, pet. denied). In light of our holding that New York Life did not breach its contract, we reverse the award of attorney's fees to Miller.

*Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1999, pet. denied); *Smith v. Sneed*, 938 S.W.2d 181, 185 (Tex. App.—Austin 1997, no writ); *Airborne Freight v. C.R. Lee Enters.*, 847 S.W.2d 289, 294-95 (Tex. App.—El Paso 1992, writ denied). Moreover, the tort of negligent misrepresentation frequently involves a defendant's statement that a contract exists, upon which the plaintiff relies, only later to discover that the contract has been rejected or never completed. *Airborne Freight*, 847 S.W.2d at 295; *see, e.g.*, *Sloane*, 825 S.W.2d at 440-442. Thus, negligent misrepresentation is a cause of action recognized in lieu of a breach-of-contract claim, and is not usually available when a contract is in force between the parties. *Airborne Freight*, 847 S.W.2d at 295.

It is not entirely clear from the record what "misrepresentations" Miller claimed were made. In his brief, Miller claims that he detrimentally relied on New York Life's representations that it would "protect his book of business by . . . mandating that unassigned agents could not develop in any manner business relations with an assigned client unless and until the assigned agent was notified." He claims that these representations were made "personally, in training, and by written word." Our review of the record indicates that nearly all of the references to "protection" of Miller's book of business involve interpretation of contractual terms.

In these circumstances, we agree with New York Life that any representations involving the degree of protection Miller would receive are not actionable in negligent misrepresentation. To the extent that Miller is claiming that New York Life's failure to honor its written contract, as Miller interprets it, itself constitutes negligent misrepresentation, his position is unquestionably erroneous. *See id.* Moreover, even if New York Life promised a degree of

16

protection beyond that contained in Miller's written contract, such a promise relates entirely to rights of the parties which are already defined by a contract in force between them and is therefore not actionable as a negligent misrepresentation. *See id.* To hold otherwise would allow Miller to convert a clear contract-interpretation dispute into a negligent-misrepresentation claim. *Cf. D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 664 (Tex. 1998). Moreover, none of New York Life's alleged statements regarding "protection" are statements of existing fact. They all relate to promises regarding future conduct only.

There are a few other representations that Carter allegedly made to Miller regarding the value of Almanza's book of business. Miller testified that Carter told him that the possibility of succeeding Almanza was "a huge opportunity," and that Miller "could make at least a hundred thousand" dollars on the Almanza book of business.[16] These are undoubtedly not statements of existing fact, and are therefore not actionable in negligent misrepresentation. *Key*, 8 S.W.3d at 709; *Allied Vista, Inc.*, 987 S.W.2d at 141; *Sneed*, 938 S.W.2d at 185; *Airborne Freight*, 847 S.W.2d at 294-95. Miller comes close to conceding as much in his brief. In responding to New York Life's argument regarding such statements, Miller states only that "[t]he Managing Partner's statements concerning potential future earning are not the only possible allegations of misrepresentations. The record is replete with descriptions of New York Life's representations as to how it would protect Miller's book of business, or any agent['s] book of business." We therefore sustain New York Life's

---

[16] Coincidentally, the jury awarded Miller $100,000 in damages for New York Life's negligent misrepresentation.

second issue, reverse the judgment of the trial court finding New York Life liable for making a negligent misrepresentation to Miller, and render judgment that Miller take nothing on this claim.

*Coffey's Tortious Interference*

We now turn to Coffey's claim that there is no evidence or insufficient evidence that he tortiously interfered with Miller's contract with New York Life. To sustain a claim of tortious interference, Miller was required to prove four elements: (1) that a contract subject to interference exists; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred. *See ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

At trial, Miller arguably introduced more than a scintilla of evidence that Coffey did not fully comply with the rules of conduct for client contact; however, he produced no evidence that Coffey's behavior amounted to willful interference with Miller's agreements with New York Life. Under its agent's contract with Miller, New York Life was obligated to resolve this commission dispute in its business judgment, an obligation which New York Life fulfilled. Ordinarily, inducing a contract obligor to do what it has a right to do is not actionable interference. *Id.* We hold that, in these circumstances, because New York Life did not breach its agreement with Miller, Coffey is not liable for tortious interference with those agreements. We therefore sustain Coffey's first issue, reverse the trial court's judgment that Coffey tortiously interfered with Miller's contract, and render judgment that Miller take nothing on his claim against Coffey.[17]

---

[17] Because the jury's award of exemplary damages was predicated on its finding of tortious interference, Miller is not entitled to recover that award.

**CONCLUSION**

The record contains no evidence that New York Life breached any contract it had with Miller. New York Life did precisely what it was obligated to do by resolving the dispute between Miller and Coffey. Because New York Life did not breach its contracts with Miller, Coffey is not liable for tortious interference with those contracts. Moreover, there is no evidence of any statement made by New York Life that is actionable as a negligent misrepresentation. We therefore reverse the judgment that the trial court entered on the jury's verdict and render judgment that Miller take nothing.

_____

Bea Ann Smith, Justice

Before Justices B. A. Smith, Puryear and Aboussie [*]

Reversed and Rendered

Filed:   July 24, 2003

---

[*]    Before Marilyn Aboussie, Chief Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998).

19