Opinion filed October 31, 2013



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00290-CV
_____

**EAGLE OIL & GAS CO., Appellant**
**V.**
**TRO-X, L.P., Appellee**

**AND**

**TRO-X, L.P., Cross-Appellant**
**V.**
**EAGLE OIL & GAS PARTNERS, LLC, Cross-Appellee**

**On Appeal from the 238th District Court**
**Midland County, Texas**
**Trial Court Cause No. CV-46,196**

### O P I N I O N

Because TRO-X, L.P. believed that Eagle Oil & Gas Co. (Eagle Oil) breached an agreement that it had with TRO-X regarding the acquisition and disposition of oil and gas leases and other oil and gas interests, it brought a cause of action against Eagle Oil for that breach. TRO-X also brought other causes of action against Eagle Oil and, later, a third party, Eagle Oil & Gas Partners, LLC

(Eagle Partners).  By way of a partial summary judgment in favor of Eagle Oil, the trial court disposed of some of the causes of action that TRO-X brought against Eagle Oil.  In the partial summary judgment, except for a tortious interference claim, the trial court also disposed of all of the causes of action that TRO-X brought against Eagle Partners.  Other issues, including damages and attorney fees, were presented to the jury.

The jury found that Eagle Oil had breached the agreement; that TRO-X had not breached the agreement; that Eagle's breach was not excused; that TRO-X had not waived its right to acquire an unpromoted working interest in the acreage covered by the agreement; that TRO-X's total damages amounted to $7,680,000; and that TRO-X was entitled to total attorney fees of $571,000.

Additionally, as far as TRO-X's claims against Eagle Partners were concerned, the jury found that Eagle Partners intentionally interfered with the agreement between TRO-X and Eagle Oil.  The jury also found that Eagle Partners did not act in the good faith belief that (1) it was acting in the bona fide exercise of its own rights or (2) it had an equal or superior right in the subject matter of the contract as opposed to that of TRO-X.  However, the jury answered "$0" when asked to assess damages to TRO-X that were proximately caused as a result of that interference.

The jury verdict was not unanimous.  The trial court instructed the jury that it could not find that harm to TRO-X was maliciously caused by Eagle Partners unless its answer was unanimous, and the jury did not answer the question regarding malice.  Because the question regarding the amount of exemplary damages was conditioned upon an affirmative answer to the malice question, the jury did not answer it.

Based upon the answers of the jury, and after the trial court denied Eagle Oil's motion for judgment notwithstanding the verdict and to disregard certain jury

findings, the trial court entered judgment in favor of TRO-X against Eagle Oil in the amount of $7,680,000. It also entered judgment that TRO-X take nothing on its claims against Eagle Partners. The trial court additionally awarded TRO-X a total of $571,000 in attorney fees. Eagle Oil and TRO-X have each perfected an appeal.

As a result of the discussion and analysis that follows, we reverse and render judgment that TRO-X take nothing from Eagle Oil on its breach of contract claims, but that TRO-X recover the sum of $379,788.80 from Eagle Oil, as shown by the court-approved accounting. We reverse the award of attorney fees to TRO-X related to the breach of contract claims and render judgment that TRO-X may not recover those attorney fees in the absence of a successful breach of contract claim. We also reverse the award of $35,000 in attorney fees that were conditioned upon an affirmative answer to the question of whether Eagle Oil breached the agreement by sending a letter to TRO-X. We render judgment that TRO-X cannot recover those fees. We affirm the take-nothing judgment against TRO-X and in favor of Eagle Partners.

Although the record in this case is quite voluminous, we will discuss only those parts of the record that are directly germane to the resolution of this appeal.

The agreement that is the subject of this lawsuit is in writing and is denominated: "ACREAGE ACQUISITION AGREEMENT: NEW PROSPECTS AND AMENDMENT NO. 1 TO SOUTH HALEY PROSPECT AGREEMENT PECOS COUNTY, TEXAS."[1] The parties to the New Prospects Agreement are TRO-X, L.P. and Eagle Oil & Gas Co.

---

[1]The parties had previously bought and sold oil and gas leases and related interests under another agreement (the South Haley Agreement). Except for references in the New Prospects Agreement to certain definitions contained in the South Haley Agreement, this lawsuit does not involve any recovery under the South Haley Agreement.

3

Under the terms of the New Prospects Agreement, Eagle Oil was to use reasonable efforts to acquire "Interests" in the New Prospects area. In the New Prospects Agreement, the parties refer to the definition of "Interests" as set out in the South Haley Agreement. There, the term "Interests" is defined to be "oil and gas leasehold interests, rights to acquire such interests such as by way of farmout and, if available, mineral and royalty interests." The agreement also contained an AMI (Area of Mutual Interest) provision. All Interests acquired under the agreement were to be taken solely in Eagle Oil's name.

If the Interests in the New Prospects were acquired within one year from the effective date of the New Prospects Agreement, Eagle Oil was to bear "all costs of acquisition for leasehold bonus, purchase consideration, third party landman title review and acquisition costs, out-of-pocket expenses incurred by those landmen, and other like or similar charges incurred in the acquisition of up to 25,000 net acres of Interests, not to exceed total maximum expenditures of $3,000,000." The parties denominated those expenses "Eagle New Prospect Expenses." No charges were to be assessed by either party or its affiliates for its own efforts in the acquisition of Interests. However, either party was allowed to recover its "out-of-pocket third party expenditures under Section II" of the New Prospects Agreement. Those allowable expenses included "supplies and printing costs of prospect sales brochures and out-of-pocket travel expenses for mileage, meals and accommodations incurred in the prospect sale process." Any such expenses incurred by TRO-X were denominated "TRO-X New Prospect Expenses." Those types of expenses that were incurred by Eagle Oil were to be added to the "Eagle New Prospect Expenses" that we have described earlier.

Thus far in this opinion, we have set out the nature of the parties' agreement regarding the acquisition of Interests. The real subject of the dispute in this lawsuit lies not in the acquisition of Interests but, rather, in the exercise of rights to retain a

4

portion of those Interests once acquired.  The dispute also involves the distribution of proceeds from the subsequent sale of some of the Interests.

Section II of the New Prospects Agreement is entitled "DISPOSITION OF INTERESTS AND DISTRIBUTION OF PROCEEDS."[2]  The heading assigned by the parties to Section II.A. is: "Retention of Unpromoted Working Interests."  In that section, Eagle Oil and TRO-X provided as follows:

> Subject to the terms of Article IV below, TRO-X may retain an unpromoted working interest of up to 40% ("TRO-X New Prospect Interest"), and Eagle may retain an unpromoted working interest of up to 60% ("Eagle New Prospect Interest") in the New Prospects and Interests acquired therein under the terms of any exploration agreement and operating agreement negotiated with the working interest owners prior to initial drilling ("Prospect Agreements"). "Unpromoted" is defined in the South Haley Agreement.[3] Unpromoted working interests shall be chosen by the Parties prior to the sale of all working interests to third parties on a promoted basis. The working interest chosen by TRO-X is the "TRO-X New Prospect Participation Percentage", and the working interest chosen by Eagle is the "Eagle New Prospect Participation Percentage".  On the day of TRO-X's selection of the TRO-X New Prospect Participation Percentage, it shall reimburse Eagle for Eagle New Prospect Expenses attributable to the TRO-X New Prospect Participation Percentage, plus pay Eagle an annualized rate of return, calculated from one year subsequent to the Effective Date of the South Haley Agreement, of eight percent (8%), and the Eagle New Prospect Expenses to be recovered under Section II.C. shall be reduced proportionately.  On the day of Eagle's selection of the Eagle New Prospect Participation Percentage, it shall reimburse TRO-X for the share of TRO-X New Prospect Expenses attributable to the selected interest, plus pay TRO-X an annualized rate of return, calculated from one (1) year

---

[2]The divisions in the New Prospects Agreement are variously referred to in the Agreement as "Sections" as well as "Articles."  We will refer to them as "Sections."

[3]In the South Haley Agreement, the parties defined "unpromoted" to mean "that the chosen working interest shall bear all third party out-of-pocket costs (i) in the acquisition of Interests, (ii) for geological and geophysical data and analysis, (iii) for running and curing title and title opinions, and (iv) for costs incurred in preparing to drill, drilling, completing, equipping and pipeline costs under the terms of the Prospect Agreements, including operating and overhead charges provided for therein."

subsequent to the Effective Date of the South Haley Agreement, of eight percent (8%), and the TRO-X New Prospect Expenses to be recovered under Section II.C. shall be reduced proportionately.

(footnote added).

In accordance with other provisions in the New Prospects Agreement, the "Eagle New Prospect Interest" was amended to read "up to 65%" and the "TRO-X New Prospect Interest" was amended to read "up to 35%."

Section II.B. of the agreement is entitled "Sale of Working Interests to Third Parties." In Section II.B., Eagle Oil and TRO-X provided as follows:

> All working interests in the New Prospects not acquired by TRO-X and Eagle under Section 2.A. [sic] above shall be sold to one or more third party working interest owners through joint sales efforts of the Parties on a promoted basis under terms acceptable to Eagle after consultation with TRO-X. TRO-X and some of its Affiliates, including Greg McCabe, Ed McCabe, Rich Masterson and Greg Hair, with Eagle's assistance, shall prepare a detailed sales brochure including land maps, geological maps and cross-sections covering all prospective horizons and shall lead the sale process, all at no expense to Eagle other than for cost recovery as otherwise provided for herein. The Parties shall use their best efforts to ensure that the sale proceeds of the New Prospects will (i) recover the unrecovered TRO-X New Prospect Expenses and the unrecovered Eagle New Prospect Expenses, (ii) if possible, provide for a cash profit, and (iii) provide non-cash sale proceeds comprised of one or more of back-in working interests, carried working interests or overriding royalties.

After the agreement was executed, interests were acquired in the New Prospects area in accordance with the agreement. There is evidence in the record that, after the New Prospects acreage was acquired, sales of the Interests in the wildcat New Prospects area were slow. However, at some point in time, Eagle Oil entered into negotiations with EnCap Investments for the sale of a portion of the New Prospects. Ultimately, Eagle Oil and EnCap struck a deal for some of the New Prospects area. Eagle Oil and EnCap structured their deal in this way: they

formed a new entity, Eagle Oil & Gas Partners, LLC. As a part of the transaction, Eagle Oil was to manage Eagle Partners and was to receive a fee of $150,000 per month for that.

On April 2, 2007, the same day that it was formed, the new entity, Eagle Partners, bought a 50% working interest in a part of the New Prospects area. Eagle Oil continued to try to sell what was left of the New Prospects acreage.

Meanwhile, the evidence shows that the relationship between TRO-X and Eagle Oil began to go downhill. On October 15, 2007, Eagle Oil sent a letter to TRO-X in which Eagle Oil, among other things, complained of TRO-X's performance under the agreement and outlined ways of going forward. TRO-X did not reply to that letter but, ultimately, filed this lawsuit against Eagle Oil and later added Eagle Partners as a defendant. Eagle Oil also filed a breach of contract counterclaim against TRO-X. We have already set forth the ultimate result of the suit.

While this lawsuit was pending in the trial court, negotiations were completed for the sale of 100% of a portion of the New Prospects—the Collier Prospect—to Chesapeake Exploration, L.L.C. Not long thereafter, Chesapeake also purchased from Eagle Oil and Eagle Partners an 85% interest in that portion of the New Prospects area known as the Balmorhea Ranch Prospect. In each sale, Chesapeake paid $325 per acre, and Eagle Oil argues that Eagle Oil retained, for it and TRO-X, an overriding royalty interest and a back-in working interest. These proceeds were to be divided in accordance with the New Prospects Agreement.

TRO-X never designated a New Prospect Participation Percentage. There was never any production on properties covered by the New Prospects Agreement, and the leases were not otherwise kept alive and, ultimately, expired.

Neither party claims that the New Prospects Agreement is ambiguous. However, each party to the contract has its own, quite different interpretation. But

7

a mere difference in interpretation is not tantamount to an ambiguity. *Providence Land Servs., LLC v. Jones*, 353 S.W.3d 538, 541 (Tex. App.—Eastland 2011, no pet.). It is only when the meaning of the agreement is uncertain and doubtful or when it is reasonably susceptible to more than one meaning that it is ambiguous. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

TRO-X is correct when it states that it is entitled to retain an unpromoted working interest of up to 35% in the New Prospects *and* in "Interests acquired" in the New Prospects "under the terms of any exploration agreement and operating agreement negotiated with the working interest owners prior to initial drilling ('Prospect Agreements')." The maximum 35% figure was known as the New Prospect Interest. The specific unpromoted interest that was actually chosen by each party up to the maximum amount was defined by Eagle and TRO-X as "TRO-X New Prospect Participation Percentage" as to TRO-X's 35% maximum; Eagle Oil's like interest of 65% maximum was designated as "Eagle New Prospect Participation Percentage."

TRO-X maintains that, although it was required to specifically designate its New Prospect Participation Percentage, it could exercise that right of designation prior to *each* sale of any working interest to third parties and, even then, only after Eagle had "consulted" with it first. TRO-X takes the position that the prior consultation requirement as contained in Section II.B. applies to its obligation to designate its New Prospect Participation Percentage in Section II.A. TRO-X also takes the position that the "consultation" requirement means that Eagle is required to advise TRO-X of the terms of *each* sale so that TRO-X can "make an informed election between accepting its percentage of the profit, retaining a working interest, or some combination of the two."

A contrary position is taken by Eagle Oil. It maintains that TRO-X was required to select its New Prospect Participation Percentage at some time prior to

8

the time that *all* working interests were sold to third parties but not as to *each* sale. And Eagle Oil argues that it was not required to reveal the terms of *each* sale to third parties to TRO-X so that TRO-X could, prior to *each* sale, "make an informed election between accepting its percentage of the profit, retaining a working interest, or some combination of the two" as argued by TRO-X.

It is Eagle Oil's position that the consultation provision in Section II.B. has nothing to do with TRO-X's selection of its New Prospect Participation Percentage as provided for by the parties in Section II.A. Section II.A. deals with the selection and cost of *retaining* unpromoted working interests by each party. Section II.B. deals with the process and details of *selling* promoted working interests that remain to third parties. And, Eagle Oil maintains, it may sell those promoted working interests to third parties on terms satisfactory to it after consultation with TRO-X.

Eagle Oil's first issue contains five parts.[4] In each part, Eagle Oil claims that the trial court erred when it "render[ed] judgment for TRO-X on its claim that Eagle breached the New Prospects Agreement by 'depriving TRO-X of its right to retain an unpromoted working interest by selling to Eagle Partners on a promoted basis without consultation with TRO-X."

In Issue 1(a), Eagle Oil claims that the trial court erred when it entered the judgment because, "as a matter of law, Eagle could not have 'deprive[d]' TRO-X of its right to retain a working interest of up to 35% because TRO-X unilaterally controlled its mature right or option to retain an unpromoted working interest at any time before the sale of all working interests to third parties" (alteration in original).

Issue 1(b) contains Eagle Oil's complaint that there was no evidence to support "the jury's finding that Eagle 'deprive[d]' TRO-X of its right to retain up

---

[4]In its statement of the issues, Eagle Oil lists its issues on appeal. When it later discusses those issues, Eagle Oil uses a different numbering system for the issues. We will use the system used by Eagle Oil in the argument portion of the brief.

to a 35% interest because Eagle sold only an undivided 50% working interest to Eagle Partners, and thus a 50% working interest remained available for TRO-X to retain even after that sale" (alteration in original).

In Issue 1(c), Eagle Oil takes the position that the "consultation" provision of Section II.B. "has nothing to do with TRO-X's right to retain an unpromoted working interest under section II.A of the agreement."

We will resolve these three arguments before going on to the other arguments made by Eagle Oil in its appeal.

Before we can address those arguments, we must first decide what the parties intended as evidenced in the written agreement. In construing a written contract, our primary objective is to determine the true intentions of the parties as expressed in the writing. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011); *Coker*, 650 S.W.2d at 393. We are to consider the entire writing "in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker*, 650 S.W.2d at 393. If the written agreement is so worded that it can be assigned a certain or definite legal meaning or interpretation, it is not ambiguous, and a court will construe the agreement as a matter of law. *Id.* A written agreement is, however, ambiguous "when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning." *Id.* Whether an agreement is ambiguous is a question for the court to decide as a matter of law. *Id.* at 394. In making that legal decision, a court examines the agreement as a whole in light of the circumstances attendant when the parties made the contract. *Id.*

TRO-X and Eagle Oil have agreed that the New Prospects Agreement is not ambiguous. Although a court can decide that an agreement is ambiguous in spite of what the parties argue to the contrary, we agree that the New Prospects Agreement can be given only one reasonable meaning and that it is not, therefore,

10

ambiguous. *See id.* at 393. Because the New Prospects Agreement is not ambiguous, we will construe it as a matter of law as it is written. *Italian Cowboy*, 341 S.W.3d at 333; *R & P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980); *Martin v. Saga Petroleum Corp.*, 332 S.W.3d 646, 650 (Tex. App.—Eastland 2010, no pet.).

Against this backdrop, we will consider Eagle Oil's complaint that, under the written agreement, as a matter of law, it could not deprive TRO-X of its right to a retained unpromoted working interest of up to 35%.

Section I of the New Prospects Agreement contained the parties' agreement with respect to the *acquisition* of "Interests" in the New Prospects. Section II.A. of the New Prospects Agreement is entitled "Retention of Unpromoted Working Interests." In it, Eagle Oil and TRO-X provided the procedure whereby Eagle Oil and TRO-X could *retain* applicable percentages of unpromoted working interests in the New Prospects. As we have said, for TRO-X, the maximum allowable percentage was called "TRO-X New Prospect Interest." Any percentage that was actually chosen by TRO-X was to be designated the "TRO-X New Prospect Participation Percentage," and the percentage actually chosen by Eagle Oil was to be designated as the "Eagle New Prospect Participation Percentage."

In Section II.A., the parties provided that the "[u]npromoted working interests" were to be "chosen by the Parties prior to the sale of *all* working interests to third parties on a promoted basis" (emphasis added). In the remainder of Section II.A., the parties detailed the method by which they were to compute the price that each had to pay for its respective "New Prospect Participation Percentage." Section II.A. contains no provisions pertaining to the *sale* of any "Interests" in the New Prospects, only the *retention* of interests by Eagle Oil and by TRO-X and the method of payment by each for the interests that each designated for retention.

11

Section II.B. contains the parties' agreement pertaining to the *sale* of promoted working interests to third parties. The parties agreed that "*[a]ll* working interests in the New Prospects not acquired by TRO-X and Eagle under Section 2.A. [sic] above shall be sold to one or more third party working interest owners" (emphasis added). The parties set forth which party was to do what in connection with the sales effort. The *sales* were to be made upon "terms acceptable to Eagle after consultation with TRO-X." Additionally in Section II.B., the parties agreed that they would use their "best efforts to ensure that the sale proceeds of the New Prospects will (i) recover the unrecovered TRO-X New Prospect Expenses and the unrecovered Eagle New Prospect Expenses" (those expenses pertaining to the acquisition of interest as set out in Section I), "(ii) if possible, provide for a cash profit, and (iii) provide non-cash sale proceeds comprised of one or more of back-in working interests, carried working interests or overriding royalties."

In Section II.B., the part of the agreement that contains the "consultation" provision, the parties mentioned neither acquisitions that they addressed in Section I nor retentions that they described in Section II.A.; the only process that the parties detailed in Section II.B. was that related to *sales* of promoted working interests.

Section II.C. of the New Prospects Agreement contains a formula to be used to compute the distribution of cash proceeds attributable to the sale of "Interests" in the New Prospects. The function of the formula was to arrive at "New Prospect Distribution Shares" for Eagle Oil and for TRO-X. Eagle Oil and TRO-X agreed that, after each party recovered certain expenses, plus a certain rate of return on each party's New Prospect Expenses, remaining cash sale proceeds were to be shared according to each party's "New Prospect Promotion Share." "New Prospect Promotion Share" is defined in Section II.C. of the New Prospects Agreement.

12

Section II.D. of the New Prospects Agreement provides for the distribution of non-cash sale proceeds, such as back-in working interests, carried working interests, or overriding royalties. These interests were to be distributed to Eagle Oil and to TRO-X "according to their respective New Prospect Promotion Shares."

Neither Section II.C. nor Section II.D. contains any provisions relating to the *retention* of an unpromoted working interest either by Eagle Oil or TRO-X. In fact, none of the distributions referred to in Section II.C. or in Section II.D. utilize the designation "New Prospect Participation Percentage" in relation to those distributions; that term is peculiar to Section II.A.

That the parties knew how to provide for the type of procedure TRO-X argues for here is apparent from Section III of the New Prospects Agreement, the AMI provision. There, within certain time constraints, if either Eagle Oil or TRO-X wanted to separately purchase an interest within the New Prospect AMI, then that party was required to notify the other party of the proposed acquisition and "provide all of the pertinent information concerning the acquisition to the other Party." The other party would then have a period of time within which it was to notify the acquiring party of its intent to acquire its share of the interest being purchased "under the same terms under which the acquiring Party is bound." "Failure to timely respond with full payment and properly executed documentation shall be deemed to be an election not to acquire."

The retention provisions of Section II.A. do not provide for that type of disclosure or privilege. As Eagle Oil argues, to say otherwise would be to require us to rewrite the New Prospects Agreement to provide: "Unpromoted working interests shall be chosen by the Parties prior to the sale of *each* or *any* working interests." We cannot rewrite the agreement to transform it into one that the parties did not make. *Neece v. A.A.A. Realty Co.*, 322 S.W.2d 597, 600 n.3 (Tex. 1959);

13

*Healthcare Cable Sys., Inc. v. Good Shepherd Hosp., Inc.*, 180 S.W.3d 787, 791 (Tex. App.—Tyler 2005, no pet.).

Eagle Oil argues that TRO-X unilaterally controlled its right to retain an unpromoted working interest of up to 35% at any time prior to the sale of *all* working interests to third parties. Therefore, Eagle Oil maintains, as a matter of law, it could not have deprived TRO-X of its right to retain an unpromoted working interest of up to 35%; the right of retention was controlled strictly by TRO-X.

Under the plain meaning of the New Prospects Agreement, in Section II.A., the parties agreed that either party could choose the unpromoted working interest that it wanted to retain prior to the sale of *all* working interests on a promoted basis. We are to give words their plain meaning unless some different or technical meaning is designated in the agreement. *Healthcare Cable*, 180 S.W.3d at 791.

The primary definition of "all" in the Merriam-Webster's Collegiate Dictionary is "the whole amount, quantity, or extent of." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 31 (11th ed. 2004). In *Enterprise Leasing*, the court was concerned with the language in a vehicle rental agreement that provided that the renter was responsible to pay Enterprise Leasing "the retail value of replacing and/or repairing *all* losses and damages to the rented car." *Enter. Leasing Co. of Houston v. Barrios*, 156 S.W.3d 547, 548 (Tex. 2004) (emphasis added). The vehicle was stolen while in the possession of the renter. *Id.* The renter claimed that he was not responsible for the theft. *Id.* The Supreme Court disagreed. *Id.* at 549. In reversing the court of appeals's decision in favor of the renter, the court wrote: "As one of the dissenting justices [in the court of appeals] succinctly stated, "'All losses' means *all* losses." *Id.*

As Eagle Oil points out, the sale to Eagle Partners did not involve a sale of *all* working interests. After the sale, a 50% interest remained, and as Eagle Oil

14

argues, the choice remained exclusively with TRO-X to choose and to select a retained unpromoted working interest of up to 35% upon payment of the amounts set out in Section II.A. The sale was not of "the whole amount, quantity, or extent of" the working interest.

TRO-X presents several scenarios in which it describes how TRO-X might have decided its course of action differently under those different scenarios if presented with the full details of each sale. We understand the difference that could make in its decision-making process. However, although that might have been a more advantageous way to draft the agreement, that is not the agreement that the parties made as is apparent from the writing itself. Contrarily, Eagle Oil argues that, under TRO-X's suggested procedure, it would be impossible to market the interests because Eagle Oil would have no way of telling a prospective customer what it had for sale.

A plain reading of Section II.B. limits the application of the "consultation" provision to that to which it refers and to which it is most closely located in the agreement, namely, *sales* "under terms acceptable to Eagle [Oil]." In no other part of the New Prospects Agreement did Eagle Oil and TRO-X use that term.

Because Eagle Oil could not, as a matter of law, deprive TRO-X of its right to retain an unpromoted working interest by selling to Eagle Partners on a promoted basis without consultation with TRO-X, we sustain Eagle Oil's Issue 1(a) and 1(c).

Eagle Oil argues that there is another reason that the judgment against it should be reversed. It maintains that there is no evidence to support the jury's answer to Question No. 1(b)—that Eagle Oil deprived TRO-X of its right to retain up to a 35% interest—when there remained a 50% interest after the sale to Eagle Partners against which TRO-X could exercise its right to retain up to a 35% unpromoted working interest.

15

When we review a legal sufficiency challenge to the evidence, we credit evidence that supports the verdict if reasonable jurors could have done so and disregard contrary evidence unless reasonable jurors could not have done so. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We will sustain a legal sufficiency challenge when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

Even though there might be consequences to Eagle Oil as a result of Eagle Oil's failure to comply with the consultation provision in connection with the *sales* of the interest, and there is evidence that it did fail,[5] as opposed to the *retention* of an unpromoted working interest, Eagle Oil reminds us that we are to measure the sufficiency of the evidence against the court's charge as actually given. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (the court's charge measures the sufficiency of the evidence when the opposing party does not object to the charge). We note that the trial court generally instructed the jury that, "other than the obligation of consultation contained in II.B. of the New Prospects Agreement, the Agreement does not require either party to disclose specific

---

[5]We do, however, agree with TRO-X that "consult" means more than "notify." To consult means "to have regard to; consider; to ask the advice or opinion of; to refer to." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 268 (11th ed. 2004).

information to the other." Specifically, in connection with Question No. 1, the trial court instructed the jury that "Eagle [Oil] did not owe a duty to offer TRO-X an opportunity to retain an unpromoted working interest for itself."

There was no objection to the general instruction. TRO-X objected to Question No. 1 in its entirety because it was not a broad-form submission. TRO-X also objected to the instruction contained in Question No. 1 regarding Eagle Oil's lack of duty to offer TRO-X an opportunity to retain an unpromoted working interest for itself because the instruction constituted a comment on the weight of the evidence. The trial court overruled the objections. Although there were other objections, there were none that are relevant to this appeal.

We hold that, under the charge as given, the evidence conclusively establishes that, because there remained enough working interest after the sale for TRO-X to exercise its right of retention to an unpromoted working interest up to 35%, Eagle Oil did not deprive TRO-X of its right to retain an unpromoted working interest by selling to Eagle Partners on a promoted basis without consulting TRO-X. Therefore, we sustain Eagle Oil's no-evidence point contained in Issue 1(b).

In Question No. 1(a), the jury was asked whether Eagle Oil failed to comply with the agreement when it sent a certain letter to TRO-X. The letter has been called a "washout" letter. Eagle Oil maintains that the letter does not constitute a breach of the agreement as a matter of law. We have considered the letter and agree. Other than various complaints that Eagle Oil set out regarding TRO-X's performance under the New Prospects and South Haley Agreements, a demand for questioned expenses, and suggested ways to go forward, Eagle Oil does little more than rehash the terms of the agreement as we have construed it. We sustain Eagle Oil's Issue 5(a).

17

Although there was some discussion in the briefs about certain cash proceeds in the Chesapeake transaction, in Question No. 1(c), the trial court only asked the jury whether Eagle Oil failed to comply with the agreement by preventing TRO-X from acquiring its proportionate share of the overriding royalty interest and back-in working interest acquired in the sale to Chesapeake. The jury answered that Eagle Oil did.

Eagle Oil asserts in Issue 2(a) that there is no evidence to support a finding that Eagle Oil prevented TRO-X from acquiring its interest in the overriding royalty interest and in the back-in working interest because TRO-X had always held the equitable title to the interest, which was retained, not acquired, in the Chesapeake sale. Further, Eagle Oil maintains that, if TRO-X's complaint is that Eagle Oil did not assign the interest to TRO-X after the Chesapeake sale, the evidence shows that TRO-X told Eagle Oil that TRO-X would not accept an assignment. This is the question that the trial court asked the jury: "Did Eagle [Oil] fail to comply with the Agreement . . . by preventing TRO-X from acquiring its proportionate share of the overriding royalty interest and working interest back-in acquired in the sale to Chesapeake?" The question was not whether Eagle Oil failed to make an assignment of the interest to TRO-X. Because TRO-X always held equitable title to those interests, Eagle Oil could not, as a matter of law, deprive TRO-X of them. Further, for the same reason, the evidence conclusively establishes that Eagle Oil did not deprive TRO-X of the interests. We sustain Eagle Oil's Issue 2(a).

In view of our rulings on the above issues, we need not consider any of Eagle Oil's other issues regarding breach of contract, waiver, or damages in connection with TRO-X's suit against Eagle Oil. We will discuss the issue of attorney fees later in this opinion.

18

We now consider TRO-X's appeal of the trial court's judgment against TRO-X and in favor of Eagle Partners.

After the trial court entered partial summary judgment in favor of Eagle Partners, the only cause of action that remained against Eagle Partners was one for tortious interference of the agreement between Eagle Oil and TRO-X. Before a claimant can recover on a tortious interference claim, "it must produce some evidence that the defendant knowingly induced one of the contracting parties to breach its obligations under a contract." *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 532 (Tex. App.—Fort Worth 2009, pet. denied). The claimant must present evidence that there has been a breach of the agreement. *N.Y. Life Ins. Co. v. Miller*, 114 S.W.3d 114, 125 (Tex. App.—Austin 2003, no pet.). As we have held, as a matter of law, Eagle Oil did not breach the agreement when it sent the letter, did not deprive TRO-X of its right of retention by selling to Eagle Partners on a promoted basis without first consulting with TRO-X, and did not prevent TRO-X from acquiring its proportionate share of the overriding royalty interest and back-in working interest acquired in the sale to Chesapeake. We have also sustained Eagle Oil's no-evidence issue and have found that, because a 50% interest remained after the sale to Eagle Partners, the evidence conclusively established that Eagle Oil did not deprive TRO-X of its right of retention in the Eagle Partners transaction. Without a finding that Eagle breached the New Prospects Agreement, TRO-X cannot recover against Eagle Partners in TRO-X's tortious interference claim.

In TRO-X's appeal of the judgment against TRO-X and in favor of Eagle Partners, TRO-X argues, in its first issue, that the trial court erred when it granted partial summary judgment in favor of Eagle Oil on several of TRO-X's claims against Eagle Oil for breach of contract. The erroneous partial summary judgment, TRO-X maintains, affected TRO-X's ability to recover against Eagle Partners on

19

the tortious interference claim because the trial court limited the duties owed by Eagle Oil in connection with the consultation provision of the agreement, such as the duty to disclose specific information about third-party sales. However, as Eagle Partners points out in a cross-point, TRO-X asserts no issue on appeal challenging the summary judgment against TRO-X and in favor of Eagle Oil.

Because there is no sustainable finding of breach of the New Prospects Agreement, TRO-X cannot recover on its tortious interference claim against Eagle Partners. Further, the jury found that any alleged interference did not proximately cause any damage to TRO-X. The cross-point is sustained, and TRO-X's first issue is overruled.

We have held that there was no sustainable finding of breach of the New Prospects Agreement against Eagle Oil. We have also held that, in the absence of such a finding, TRO-X cannot recover from Eagle Partners on TRO-X's claim of tortious interference. Therefore, we need not address Issues II, III, and IV raised by TRO-X in its appeal from the take-nothing judgment in favor of Eagle Partners.

We now address the award of attorney fees. In Question No. 7, the jury was asked to assess the amount of attorney fees to be awarded as damages up to December 5, 2007. The jury found those fees to be $35,000. The trial court instructed the jury not to answer the question unless it had found that Eagle Oil breached the agreement when it mailed the letter of October 15, 2007. We have held that Eagle Oil did not, as a matter of law, breach the agreement by sending the letter. Further, there is no evidence that Eagle Oil damaged TRO-X when it sent the letter. Nor was inquiry made of the jury of any such damages except for attorney fees. In the absence of either a breach or damages caused by that breach, the award of attorney fees of $35,000 cannot stand as this case was submitted to the jury. We sustain Eagle Oil's fifth issue.

In Question No. 10, the trial court asked the jury to find the "reasonable fee for the necessary services of TRO-X's attorneys for pursuing the breach of contract claims" against Eagle Oil in connection with the Eagle Partners transaction and the Chesapeake transaction. Because we have held that, as a matter of law, Eagle Oil did not breach the agreement as submitted to the jury and that there was no evidence to support a finding that Eagle Oil breached the agreement by selling a 50% promoted working interest to Eagle Partners without consulting with TRO-X, the part of the judgment awarding these attorney fees must be reversed. We sustain Eagle Oil's fourth issue.

We have considered all issues necessary to the disposition of this appeal. We reverse that portion of the trial court's judgment wherein it held that Eagle Oil had breached the New Prospects Agreement as found by the jury in Question Nos. 1(a), 1(b), and 1(c). We render judgment that TRO-X take nothing in that regard from Eagle Oil. We affirm the judgment that TRO-X take nothing from Eagle Partners because there could be no interference without a breach of the agreement by Eagle Oil. The trial court approved the findings in the court-ordered accounting. We render judgment that TRO-X recover the sum of $379,788.80 ($1,064,789.45 due to TRO-X less $685,000.65 in expenses due to Eagle Oil) as shown by the accounting. We reverse the award of attorney fees and render judgment that TRO-X take nothing in this appeal for attorney fees.

October 31, 2013

TERRY McCALL

Panel consists of: Wright, C.J., McCall, J., and Hill.[6]

JUSTICE

Willson, J., not participating.

---

[6]John G. Hill, Former Chief Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.